COUNTRY VILLAGE HOMES, INC., B & A Realty, Inc., M.B. Schauer Homes, Inc., Schauer Family Trust, and Monte B. Schauer, Appellants,

v.

Robert E. PATTERSON and Sherry Patterson, Appellees.

No. 01–03–01240–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 16, 2007.

John W. Berkel, Robert A. Plessala, Cokinos, Bosien & Young, Houston, TX, for Appellants.

David A. Bryant, The Bryant Law Firm, Spring, TX, Richard N. Countiss, Countiss Law Firm, Steve J. Kherkher, Williams–Bailey Law Firm, L.L.P., Houston, TX, for Appellees.

Panel consists of Justices TAFT, JENNINGS, and ALCALA.

## OPINION

ELSA ALCALA, Justice.

Appellants, Country Village Homes, Inc., B & A Realty, Inc., M.B. Schauer Homes, Inc., Schauer Family Trust, and Monte B. Schauer (collectively Country Village), appeal a judgment, entered in accordance with the jury's verdict, that awarded $550,000 in damages to appellees, Robert E. and Sherry Patterson, in a dispute over the construction of the Pattersons' house. The jury determined that the Pattersons owed Country Village nothing for various "extras" over and above the contract price; that the appellants, though ostensibly separate entities, acted as a single business enterprise (the Single Business Enterprise theory); that Schauer was responsible for the conduct of Country Village Homes, Inc. (the Alter Ego theory); that flaws in the construction of the house breached Country Village's contract with the Pattersons; that the cost of repair was $300,000; and, that the difference between fair market value of the property had it been built properly and the fair market value of the property if repaired would be $250,000. The trial court entered judgment in favor of the Pattersons against Country Village Homes, Inc., B & A Realty, Inc., M.B. Schauer Homes, Inc., Schauer Family Trust, and Monte B. Schauer, jointly and severally, in the amount of $712,890.41.[1]

On appeal, Country Village presents five issues, asserting that:

(1) Under article 2.21 of the Business Corporations Act, (a) any recovery on the common law theory of Single Business Enterprise is preempted; (b) the article's requirement of actual fraud was not properly presented to the jury in the questions concerning the Pattersons' Alter Ego and Single Business Enterprise theories; and (c) the evidence is legally and factually insufficient to support the

---

1. The trial court awarded the Pattersons $162,890.41 in prejudgment interest.

jury's findings that the Pattersons proved their Alter Ego or Single Business Enterprise theories;

(2) Under the Residential Construction Liability Act, Country Village made a reasonable settlement offer or there was legally and factually insufficient evidence to prove otherwise, and the damages available to the Pattersons were thereby limited;

(3) The evidence generally was legally and factually insufficient to support the jury's findings on liability and damages;

(4) The absence of certain evidence from the appellate record requires a new trial; and

(5) Country Village's claim for "extras" was established as a matter of law, or alternatively the jury's contrary finding was against the great weight and preponderance of the evidence.

We conclude that Country Village only preserved its sufficiency of the evidence arguments for our review. We hold that the evidence is legally and factually sufficient to support the jury's findings. We affirm.

## Background

Country Village Homes, Inc., a Texas corporation owned and operated by Schauer, built custom homes in certain subdivisions in northwest Houston. Schauer also controlled two other Texas corporations: M.B. Schauer Homes, Inc., a building company for other subdivisions; and B & A Realty, a land developer. Schauer was the sole shareholder, director, and president of all three corporations. The Schauer Family Trust was created by Schauer for the benefit of his family.

Robert Patterson and his wife Sherry, in their search for their "dream house," found the Gleannloch subdivision and chose Country Village to construct their custom home. They selected architect Kirby Fleming, whom Schauer recommended, to design the house to their specifications.

The Pattersons and Country Village signed an earnest money contract in June 1999 for the purchase of the lot and the construction of the house for a total of $719,195 to be paid on a draw schedule. The contract expressly referenced and incorporated Fleming's plans, and provided that "[i]n the event Purchaser desires any extras, Purchaser shall pay for said extras in advance." [2] The contract, however, does not precisely match the plans; for example, it includes "Additional Conditions," the first of which is "Stucco trim around windows," whereas the plans called for cast stone around the windows. Shortly after signing the earnest money contract, the Pattersons granted Country Village a mechanic's lien on the property.

The Pattersons actively participated in the construction of their house. They frequently visited the building site, and made many requests for changes in the plans. They requested that a first floor wall be moved to add space to the living area. They opted for eight-foot doors instead of six-foot doors. Sherry and her interior decorator opted for various upgrades from the original plans. Robert, who enjoyed cooking out, asked that a "summer kitchen" be built in the backyard; later, when dissatisfied with Country Village's efforts, the Pattersons had most of the original summer kitchen demolished and brought

**2.** "Extras" refers to changes or additions to the house beyond the contract. The term "overages," used at trial almost interchangeably with "extras," refers more specifically to purchases in excess of certain "allowances" in the contract. Any change to the contract that increased cost to the builder would be an "extra."

in an outside company to redo that part of the project.

In November 1999, the Pattersons asked Schauer what extras and overages they owed on upgrades they had already selected. Schauer presented them with an invoice totaling $11,564.96. Robert gave Schauer a check for $15,000 to cover the invoice and the price of a refrigerator that had been ordered but that had not yet been charged to Country Village. The Pattersons asked Schauer how much more they could expect to pay in extras; he told them that they would not owe more than an additional $15,000.

In April 2000, when preparing to close on the house, the Pattersons contacted Schauer again about extras. On April 14, Robert drove to Schauer's office and received a bill for extras in excess of $100,000. Distraught, Robert called Schauer, who said that he had not yet reviewed the bill. The Pattersons did not pay this bill, and moved into the house on April 19 or 20.

On April 26, Schauer came to the house to meet with the Pattersons. The Pattersons were joined by their real estate agent and their interior decorator. After arriving, Schauer spent nearly an hour in the backyard talking on his mobile phone. The real estate agent and the decorator left for other clients; after they were gone, Schauer came inside to talk. Schauer went with Robert into Robert's office, and presented a second bill for extras. The listed extras totaled $88,709.01; after the deduction of certain credits, Country Village claimed that the Pattersons owed $54,854.01. Schauer did not bring any documentation to support the individual charges on the bill. Robert felt the second bill was "still ridiculous," and included items for which the Pattersons had already

paid outside of the boundaries of the contract. Robert believed that many of the items were charges that had accrued before Schauer provided the partial invoice for extras the previous December, but that had not been included in that invoice, which Schauer at the time said included all the charges that the Pattersons then owed. Schauer left without resolving the dispute.

Robert instructed the lender to send the last of the draw schedule payments to him instead of Schauer. When Schauer called requesting the last payment, Robert asked if Schauer had signed an "All Bills Paid Affidavit," and Schauer said that he had. Robert sent the last of the draw schedule payments to Country Village in May 2000. The affidavit in question was included in the record as plaintiff's exhibit 12; it is notarized, and indicates that Schauer signed it on June 21, 2000.

In the meantime, the Pattersons noticed flaws in the house. On April 28, two days after receiving the second bill for extras, the Pattersons sent a "punch list" to Country Village requesting that certain minor repairs be made. Country Village did nothing regarding this list. The Pattersons paid others to get much of the repair work done.

The next communication the Pattersons received from Country Village was an August 4, 2000 letter from Country Village's attorney that demanded payment for the extras in the amount of $20,581.59. Country Village filed suit against the Pattersons for that amount on October 23. The Pattersons hired counsel, who responded on November 13 with a letter that noted that the items on the final punch list were not completed as promised and added 14 additional complaints, including that their porte-cochere was collapsing.[3] On Decem-

---

**3.** A "porte-cochere" is "a passageway through a building or screen wall designed to

ber 7, the Pattersons counter-sued Country Village, alleging breach of contract, fraud, violations of the Deceptive Trade Practices Act, and damages for violations of the Trust Fund Statute. On December 19, they filed a third-party petition against Schauer, alleging that Country Village was his alter ego.[4]

Country Village responded with a letter dated December 29 that purported "to make an offer of settlement pursuant to Section 27.004 of the Residential Construction Liability Act." The letter made various offers to address most items on the punch list—which had since been updated by the Pattersons—as well as the additional items in the Pattersons' letter of November 13. The proposed standard of repair was "to the reasonable satisfaction of the Pattersons," and in case of a dispute the parties were to defer to the home warranty inspector.[5] In the letter, Country Village required payment of one-half of the $20,581.59 for extras be paid before repair work began, and the remainder of the charges when repairs were complete. The Pattersons did not respond to this letter.

At some point between the exchange of letters and the trial of the case, Country Village transferred most or all of its assets to another building company belonging to Schauer, Vintage Custom Homes. Further, Country Village transferred $100,000 as a "consulting fee" to M.B. Schauer Homes, which was not engaged in any active business at the time. No consulting appears to have been done; a witness at trial said the $100,000 transfer was in fact for tax purposes.

The case went to trial in September 2003. Country Village's live pleadings were its first amended petition and third supplemental petition, in which it sought a total of $31,883.09 in damages from the Pattersons, along with attorney's fees and interest.[6] In their sixth amended consolidated counterclaim and third-party petition, the Pattersons sought recovery against all appellants as well as Vintage Custom Homes, raising claims of civil conspiracy, negligence, negligent misrepresentation, common law fraud, statutory fraud under the Residential Construction Liability Act, violations of the Deceptive Trade Practices–Consumer Protection Act, breach of contract, breach of express and implied warranties, and declaratory relief. They did not specifically plead a dollar amount of damages, but alleged that the defendants should be held jointly and severally liable and the corporate veil should be pierced under a number of theories including that each of the corporate entities and the trust were alter egos for Schauer and each other, and that the equi-

---

let vehicles pass from the street to an interior courtyard" or "a roofed structure extending from the entrance of a building over an adjacent driveway and sheltering those getting in or out of vehicles." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed.2003).

4. In July 2002, the Pattersons filed a Second Amended Third–Party Petition adding all appellants in the present case as well as a number of other parties who have since been severed or dismissed.

5. No home warranty inspector appears to be named in the letter. The inspector during construction of the home was Billy Shaw, who testified at trial that he did not remember much about the construction of the house, but attested to the validity of his reports that gave the construction "a clean bill of health." Testimony at trial established that the home warranty company for which Shaw worked went bankrupt during the construction of the Pattersons' home, and therefore the Pattersons had no warranty.

6. In its supplemental petition, Country Village added a claim for payment of more than $11,000 for a set of windows.

table doctrine of Single Business Enterprise should apply.

At trial, the issues presented were whether the Pattersons owed Country Village for extras, and whether and to what extent Country Village owed the Pattersons for repairs. No individual extra was given any special emphasis, but the Pattersons pointed to a number of flaws in the construction, including:

- a slope in the floor on the second story;
- a set of windows that did not close properly;
- leaks in the roof;
- cracks in concrete;
- cracks in the kitchen tile as a result of cracked concrete;
- tilted cast-stone pillars near the front door;
- a lack of "expansion joints" in the exterior brick walls;[7] and
- the collapsing porte-cochere.

Country Village first called Schauer to testify. He described the nature of the construction process, including the inspections that take place periodically while the home is being built. He described some of the extras that the Pattersons requested. He stated that the problems with the house were entirely cosmetic, and that the Patterson's proposed solutions were far too drastic. He examined arrays of photos that had been taken over three years, explaining how these photos showed that the problems with the house were not structural. He acknowledged that his companies met many of the factors associated with the Pattersons' joint-and-several liability theories, for instance keeping a single office and using one receptionist and one accountant, as well as making interest-free loans between the companies. He

also explained that the corporate appellants were distinct entities because, for example, the different building companies operated in different subdivisions, and because one was not a building company at all. He said that fund transfers between the companies were for tax purposes, and not to avoid liability in this case.

Country Village also called a number of expert witnesses in the field of engineering, all of whom agreed that the problems with the Pattersons' house were largely cosmetic. They described the limited repairs that they believed were necessary. They also said that the problems identified by the Pattersons either were normal variations—for example, that no house is completely level—or were normal characteristics of materials used. Inasmuch as Country Village's experts acknowledged errors in the construction, they claimed repairs would be easy and inexpensive, and that the Pattersons should have allowed Schauer's subcontractors to complete the repairs.

Country Village further called two witnesses in relation to financial issues. One was an appraiser, who estimated that the Pattersons' house was worth $855,000 as constructed. The appraiser further stated that whatever defects the house might have, its market value would remain $855,000 so long as proper repairs were made. Another was the accountant for Schauer's businesses, who stated that Internal Revenue Service regulations and Generally Accepted Accounting Principles permit Schauer to have different businesses and different corporations.

Country Village also attempted to paint the Pattersons as vindictive, and their counterclaims as a form of revenge. For example, John Darbonne, the on-site salesman for the Pattersons' subdivision, testi-

7. Expansion joints allow the brick exterior to expand and contract as the weather changes.

fied that Robert called him after receiving the $100,000 bill. Darbonne stated that he had taken notes following the conversation, one of which read: "He's really pissed. Will go after him in every way he can."

The Pattersons testified that they were the wronged parties, not Country Village, and that the problems with the house had ruined the experience of moving into their dream home. For example, the sloping upper floor felt like a "fun house," and people who sat on the upstairs commode felt like they would slip off. They averred that, contrary to the statements of Country Village's experts, the slope in the upper floor was getting worse over time. Although they admitted to ordering a number of extras, and stated that they wanted to pay what they owed, they presented a number of reasons why the various amounts that Country Village asked them to pay were unreasonable. They contended that Country Village's settlement offer of December 29, 2000 was unreasonable because it required them to pay money that was in dispute in order to have repairs made, when the need for some of those repairs was not in dispute. They stated that Schauer repeatedly told them that any extras after they wrote a $15,000 check in December 1999 would cost no more than a further $15,000. They said, overall, that they felt that they had been taken advantage of in pursuit of their dream house.

The Pattersons also presented expert witnesses who testified regarding the extent of the damages alleged. Their structural engineer stated that the second floor was sagging because of an undersized beam or beams, and the framing of the second floor would need to be entirely replaced. This, he said, would require a replacement roof. The porte-cochere would require extensive repair, and the cracks in the concrete would need to be filled. The engineer estimated that repairs would cost approximately $300,000. The CEO of the company that the Pattersons hoped to hire to repair the house testified that, based on the engineer's report, the repairs would cost in excess of $350,000, and no lesser repairs would be effective.

The Pattersons' financial expert cast doubt on the charges sought by Country Village, testifying that he had "extreme difficulty in satisfying myself" as to the validity of a variety of line items included in Country Village's demand letter. He stated that even giving the benefit of the doubt to Country Village on the questionable items, he estimated that the Pattersons had overpaid Country Village, and were entitled to a refund.[8] He also testified that the conduct of Country Village and the other defendants satisfied the Single Business Enterprise and Alter Ego theories.

The Pattersons' real estate appraiser testified that the market value of the house, had it been properly constructed, would have been approximately $885,000. The appraiser also explained the theory of "stigma," under which it is possible to estimate the reduction in market value of a home due to the reluctance of buyers to purchase a house that has undergone extensive repairs. He explained the methods by which he applied this theory, and stated that he estimated the value of the Pattersons' house—if it were repaired as the Pattersons' engineer recommended—

8. The expert was not clear about how much refund the Pattersons might be owed. At one point he stated that the Pattersons were owed $12,190, and at another point that, depending on the determination of one invoice, the Pattersons might be owed only $6,800. The Pattersons did not sue for any refund.

would be approximately $575,000, a difference of $310,000.

By a vote of 10–2, the jury found that:

- Country Village did not install any extras or perform any work installing extras for which it had not been compensated;
- Country Village's section 27.004 settlement letter was not a reasonable offer;
- Country Village failed to substantially comply with the contract, and that the failure was a "producing cause" of damage to the Pattersons;
- reasonable repair damages were $300,000, and reasonable stigma damages were $250,000; and
- all appellants acted as a Single Business Enterprise, and Schauer was responsible for the conduct of Country Village Homes, Inc.

Country Village filed a motion for judgment notwithstanding the verdict. The Pattersons filed a motion to sever Vintage Custom Homes from the case. The trial court severed Vintage Custom Homes, and entered judgment on the verdict against the remaining defendants, awarding damages and pre- and postjudgment interest. Country Village then filed a motion for new trial that the trial court denied.

Country Village timely filed a notice of appeal and properly paid for the reporter's record in this case. However, the reporter's record was not filed until after we held the court reporter in contempt of court. The record remains incomplete. At our request, the trial court entered findings of fact and conclusions of law regarding the incomplete reporter's record.

### General Standards of Review

In four of its five issues on appeal, Country Village contends that the evidence is legally and factually insufficient to support most of the jury's findings. In their response, the Pattersons contend that various of Country Village's issues and sub-issues are objections to the jury charge that have not been preserved for our review. We must apply different standards of review for these two arguments.

### A. Sufficiency of the Evidence

In reviewing the trial court's verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). A challenge to the legal sufficiency of evidence will be sustained when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla. *Id.* at 810. Evidence does not exceed a scintilla if it does no more than create a mere surmise or suspicion that the fact exists. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004).

In determining the factual sufficiency of the evidence to support a jury's finding, courts of appeals are to weigh all the evidence, both for and against the finding. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001). In reviewing a factual sufficiency challenge to a finding where the burden of proof is not on the complaining party, we set aside the verdict only if the evidence in support of the finding is so weak as to render the verdict clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). In reviewing a factual sufficiency challenge to a finding where the burden of proof is on the complaining party, that party must show that "the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem.,* 46 S.W.3d at 242. In conducting our review, we may not substitute our judgment for that of the jury, which is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Golden Eagle*

*Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003).

**B. Preservation of Objections to the Jury Charge**

"Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX.R. CIV. P. 274. To be sufficiently specific, the party's objection must identify the claimed error and explain the basis of the party's complaint. TEX.R. CIV. P. 274; *Castleberry v. Branscum,* 721 S.W.2d 270, 276 (Tex.1986). A sufficiently specific objection enables the trial court to understand the party's precise grounds and to rule. *Castleberry,* 721 S.W.2d at 276.

■ We determine whether a party has preserved error in the jury charge by inquiring whether a party has (1) presented to the trial court a timely request, motion, or objection, (2) stated the specific ground, and (3) obtained a ruling. TEX.R.APP. P. 33.1(a); *see In re B.L.D.,* 113 S.W.3d 340, 349 (Tex.2003); *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992); *see also Miga v. Jensen,* 96 S.W.3d 207, 212–13 (Tex.2002) (upholding preservation based on *Payne* ); *Alaniz v. Jones & Neuse, Inc.,* 907 S.W.2d 450, 451–52 (Tex.1995) (noting that *Payne* did not revise preservation requirements of rules of civil procedure regarding jury charge, but did mandate that those requirements be applied in common sense manner that serves, rather than defeats, rules of procedure). Further, a party must present its objections to the charge (1) to the trial court, either in writing or by dictating them to the court reporter, (2) in the presence of the court and opposing counsel, and (3) before the charge is read to the jury. TEX.R. CIV. P. 272. An objection not presented to the trial court during this time is waived. *Id.* Specifically, for

the trial court "to resolve a legal issue before the jury could properly perform its fact-finding role[,] . . . a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial." *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) (quoting *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 94 (Tex.1999)).

**Piercing the Corporate Veil**

■■ In its first issue, Country Village complains that the Single Business Enterprise and Alter Ego theories—presented to the jury in questions nine and ten—are unsupported by Texas law or by legally or factually sufficient evidence. Specifically, Country Village asserts that:

- the Single Business Enterprise and Alter Ego theories are contrary to and pre-empted by article 2.21 of the Business Corporation Act, TEX. BUS. CORP. ACT ANN. art. 2.21 (Vernon 2003);
- the jury did not find "actual fraud" as required by article 2.21, *id.* art. 2.21(A)(2);
- if the jury found "actual fraud," that finding is not supported by legally or factually sufficient evidence; and
- the jury's findings on the remaining elements of the Single Business Enterprise and Alter Ego theories are not supported by legally or factually sufficient evidence.

The theories of Single Business Enterprise and Alter Ego are both methods to disregard the corporate fiction. *Aluminum Chem. (Bolivia) Inc. v. Bechtel Corp.,* 28 S.W.3d 64, 68 (Tex.App.-Texarkana 2000, no pet.). They create a means of imposing liability where none would otherwise exist. *Id.* The two theories are separate and distinct, *id.,* and the trial court presented separate questions on each theory.

**A. Single Business Enterprise**

■ The Single Business Enterprise theory is an equitable doctrine used to disregard separate corporate identities when multiple corporations do not operate separately, but instead integrate their resources to achieve a common business purpose. *Hoffmann v. Dandurand*, 180 S.W.3d 340, 347–48 (Tex.App.-Dallas 2005, no pet.); *Old Republic Ins. Co. v. Ex–Im Servs. Corp.*, 920 S.W.2d 393, 395–96 (Tex. App.-Houston [1st Dist.] 1996, no writ). Its viability in Texas, however, is not clear. The supreme court has expressly declined to decide whether the Single Business Enterprise theory is "a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure." *S. Union Co. v. City of Edinburg*, 129 S.W.3d 74, 87 (Tex.2003). Many courts of appeals continue to apply the theory, including in cases decided after the supreme court issued its opinion in *Southern Union*. *See Formosa Plastics Corp., USA v. Kajima Int'l, Inc.*, 216 S.W.3d 436, 460 (Tex.App.-Corpus Christi 2006, pet. filed) (applying Single Business Enterprise theory after *Southern Union*); *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 150 S.W.3d 718, 744 (Tex.App.-Austin 2004, pet. granted) (same); *In re U–Haul Int'l, Inc.*, 87 S.W.3d 653, 657 (Tex.App.-San Antonio 2002, orig. proceeding) (applying theory pre-*Southern Union*); *Hall v. Timmons*, 987 S.W.2d 248, 255 (Tex.App.-Beaumont 1999, no pet.) (same); *Old Republic*, 920 S.W.2d at 395–96 (same); *see also Hoffmann*, 180 S.W.3d at 348 (recognizing theory's validity after *Southern Union*, but concluding that facts of case did not fit theory); *Carlson Mfg., Inc. v. Smith*, 179 S.W.3d 688, 693–94 (Tex.App.-Beaumont 2005, no pet.) (same). The Texarkana court of appeals, however, has emphasized that in cases founded in contract, article 2.21 controls all veil-piercing claims, and thus the "actual fraud" requirements of that statute apply. *See Texas–Ohio*

*Gas, Inc. v. Mecom*, 28 S.W.3d 129, 137–38 (Tex.App.-Texarkana 2000, no pet.).

Factors commonly considered in determining whether corporations operate as a single business enterprise include, but are not limited to, the following: (1) common employees, (2) common offices, (3) centralized accounting, (4) payment of wages by one corporation to another corporation's employees, (5) common business name, (6) services rendered by the employees of one corporation on behalf of another corporation, (7) undocumented transfers of funds between corporations, and (8) unclear allocation of profits and losses between corporations. *See Nat'l Plan Adm'rs*, 150 S.W.3d at 745. However, the supreme court in *Southern Union* stated that findings of common directors, shared employees, and central accounting and payroll systems "do not justify disregarding the corporate structures of affiliated companies." 129 S.W.3d at 89.

In the present case, in question nine, the jury was asked:

> On the occasion in question, were any two or more of the following entities acting together as a single-business enterprise: Monte B. Schauer, Vintage Homes, Inc., M.B. Schauer Homes, Inc., B & A Realty, the Schauer Family Trust, and Country Village Homes, Inc.?
>
> > Two or more corporations, entities or individuals are operating as a single business enterprise if they are not operated as separate entities, but rather integrate their resources to achieve a common business purpose.

The trial court then listed the factors as enumerated in *National Plan Administrators*. *See* 150 S.W.3d at 745. The jury answered yes as to each of the appellants. Country Village did not object to the form or content of this question.

**B. Alter Ego**

Generally, a corporation exists as a separate legal entity, insulating its shareholders from personal liability. *Hoffmann*, 180 S.W.3d at 347. The Alter Ego theory applies when there is such a unity between corporation and individual that the corporation has ceased to be a separate entity, and allowing the individual to avoid liability through the use of the corporate form would work an injustice. *See id.* (citing *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex.1990)). Evidence relevant to prove an Alter Ego theory includes: (1) payment of alleged corporate debts with personal checks or other commingling of funds, (2) representations that the individual will financially back the corporation, (3) diversion of company profits for the individual's personal use, (4) inadequate capitalization, and (5) other failures to keep corporate and personal assets separate. *Id.* (citing, *inter alia, Mancorp*, 802 S.W.2d at 229.) Failure to comply with corporate formalities is no longer a factor in considering whether Alter Ego exists. *Id.; see also* TEX. BUS. CORP. ACT ANN. art. 2.21 § A(3) (Vernon 2003). A showing that an individual is an officer, director, or majority shareholder is insufficient to support a finding of Alter Ego. *Hoffmann*, 180 S.W.3d at 347.

In question ten, the jury was asked:

Is Monte B. Schauer responsible for the conduct of Country Village Homes, Inc.? Monte B. Schauer is "responsible" for the conduct of Country Village Homes, Inc., if:

Country Village Homes, Inc., was organized and operated as a mere tool or business conduit of Monte B. Schauer, there was such unity between Country Village Homes, Inc., and Monte B. Schauer that the separateness of Country Village Homes, Inc., had ceased and holding only Country Village Homes, Inc., responsible would result in injustice; and Monte B. Schauer caused Country Village Homes, Inc., to be used for the purpose of perpetuating and did perpetuate an actual fraud on Robert and Sherry Patterson primarily for the direct personal benefit of Monte B. Schauer.

In deciding whether there was such unity between Country Village Homes, Inc., and Monte B. Schauer that the separateness of Country Village Homes, Inc., had ceased, you are to consider the total dealings of Country Village Homes, Inc., and Monte B. Schauer, including:

1. the degree to which Country Village Homes, Inc.'s property had been kept separate from that of Monte B. Schauer;

2. the amount of financial interest, ownership, and control Monte B. Schauer maintained over Country Village Homes, Inc.; and

3. whether Country Village Homes, Inc., had been used for personal purposes of Monte B. Schauer.

"Actual fraud" means actions involving dishonesty of purpose or intent to deceive.

Country Village did not object to the form or content of this question. The jury answered yes.

## C. The Business Corporation Act and *Southern Union* [9]

The Business Corporation Act has been superceded as of January 1, 2006 by the Business Organizations Code. TEX. BUS. ORG.CODE ANN § 402.001(a) (Vernon 2006). However, the Business Corporation Act continues to govern those events before January 1,

---

9. *Southern Union* was decided after the events giving rise to this case occurred. *S. Union Co. v. City of Edinburg*, 129 S.W.3d 74 (Tex. 2003). As a rule, court decisions apply retroactively. *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex.1999).

■ Country Village asserts that article 2.21 of the Business Corporation Act is the exclusive manner for piercing the corporate veil. The article states, in relevant part:

A. A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:

. . .

(2) any contractual obligation of the corporation *or any matter relating to or arising from the obligation* on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate *caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud* on the obligee primarily *for the direct personal benefit* of the holder, owner, subscriber, or affiliate;

. . .

B. The liability of a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for an obligation that is limited by Section A of this article *is exclusive and preempts any other liability* imposed on a holder, owner, or subscriber of shares

of a corporation or any affiliate thereof or of the corporation for that obligation under common law or otherwise, except that nothing contained in this article shall limit the obligation of a holder, owner, subscriber, or affiliate to an obligee of the corporation when:

. . .

(2) the holder, owner, subscriber, or affiliate is otherwise liable to the obligee for the obligation under this Act or another applicable statute.

TEX. BUS. CORP. ACT ANN. art. 2.21 (emphasis added).[10]

In *Southern Union*, the supreme court held that an assertion of the common law Single Business Enterprise theory failed when there was insufficient evidence of "actual fraud" as required by article 2.21 and the jury charge. 129 S.W.3d at 88. The City of Edinburg had entered into a contract embodied in city ordinances with a natural gas supplier. *Id.* at 75–76. The supplier agreed to pay a 4% franchise tax. *Id.* at 76. The issue before the supreme court was whether several companies affiliated with the supplier were subject to the tax based on a Single Business Enterprise theory. *Id.* The supreme court held that the affiliated companies were not subject to the tax. *Id.*

In reviewing the jury's affirmative finding on a Single Business Enterprise question, the court noted that it had never considered the theory "in any detail." *Id.* at 86. The court declined to "decide . . . whether a theory of 'single business enter-

2006. *Id.* § 402.006 (Vernon 2006). We therefore analyze this case under the prior statute.

10. The legislature added the provision in article 2.21 § A(2) that requires an "actual fraud" and the provision in 2.21 § B that preempts common law piercing of the veil in response to the supreme court's decision in *Castleberry v. Branscum.* TEX. BUS. CORP. ACT

ANN. art. 2.21 cmt.1996; 721 S.W.2d 270, 272–73 (Tex.1986). In that case, the Supreme Court, relying on the common law theory of "sham to perpetuate a fraud," approved a piercing of the corporate veil where there was a finding only of constructive fraud, and not actual fraud. *Castleberry,* 721 S.W.2d at 272–73.

prise' is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure and the theories of joint venture, joint enterprise, or partnership for imposing joint and several liability." *Id.* at 87. The supreme court held that whatever label is applied to a veil-piercing theory, article 2.21 of the Texas Business Corporation Act controls. *Id.* The court concluded that the City's attempt to treat the supplier and the affiliated companies as a single business enterprise failed because no evidence supported a finding of "actual fraud." *Id.* at 88; *see also* TEX. BUS. CORP. ACT ANN. art. 2.21 (Vernon 2002). Specifically, the supreme court held that there was no evidence of "conduct involving dishonesty of purpose or intent to deceive" as required by the jury charge's definition of "actual fraud." *S. Union,* 129 S.W.3d at 88.

■ Because the supreme court has held that article 2.21 controls veil-piercing claims, we conclude that a finding of actual fraud is required in order to prove a theory of Single Business Enterprise. *See* TEX. BUS. CORP. ACT ANN. art. 2.21 cmt.1996; *S. Union,* 129 S.W.3d at 87.

### D. Omissions from the Charge

Question nine of the jury charge, concerning single business enterprise, did not mention fraud at all, and question ten, regarding alter ego, defined actual fraud as "actions involving dishonesty of purpose or intent to deceive." We must determine, therefore, the consequences of the failure

by Country Village to object to the jury charge or to make the trial court aware of its contentions that article 2.21 controls theories by which the corporate veil may be pierced, that Single Business Enterprise is not a valid theory under Texas law, and that if it is recognized as a theory then it requires a finding of actual fraud. *See State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992).

■ The Pattersons assert that their Single Business Enterprise theory was not challenged by any trial objection, charge objection, or motion. They further state that no question or instruction was submitted by Country Village with respect to "actual fraud," and if it is in fact a missing element of the Pattersons' Single Business Enterprise theory, then it should be deemed found by the trial court. *See* TEX.R. CIV. P. 279.

Nothing in the record indicates that Country Village ever made the trial court aware of its contentions relating to article 2.21 and actual fraud. Country Village asserts that it was not required to object because objection is not required to preserve error on an omitted independent ground of recovery, and its theory on appeal is that the Pattersons were required, but failed, to submit common law fraud as a separate and independent ground of recovery in order to pierce the corporate veil.[11]

11. Country Village additionally points out in a supplemental post-submission letter brief to this Court that the supreme court's opinion in *Southern Union* did not issue until October 31, 2003, after judgment was rendered in this case. The supreme court in *Southern Union* pointed out that article 2.21 governed contractual veil-piercing claims since 1993, *see* 129 S.W.3d at 87–88, casting doubt on Country Village's contention that *Southern Union* made new law. *See also Texas–Ohio Gas, Inc.*

*v. Mecom,* 28 S.W.3d 129, 137–38 (Tex.App.-Texarkana 2000, no pet.) (holding that article 2.21 controls all veil-piercing claims). Even assuming that *Southern Union* effected a change in the law that otherwise would excuse Country Village from presenting its contentions to the trial court, we note that *Southern Union* issued while the trial court retained plenary power in the case. We further note that Country Village filed its motion for new trial on November 5, 2003, after *Southern*

In a charge conference on the record, Country Village's trial counsel objected to questions six through ten, asserting that there was no evidence or insufficient evidence to support the submission of the issues and that any answer of yes would be against the great weight and preponderance of the evidence. The trial court overruled these objections. The clerk's record contains a Trial Preparation Order submitted by Country Village, which includes proposed jury questions that do not address any of the Pattersons' veil-piercing theories.[12] Country Village's motion for new trial and for judgment notwithstanding the verdict challenge only the legal and factual sufficiency of the evidence to support the jury's findings. Country Village never presented the trial court with its contentions regarding article 2.21 and actual fraud. Thus, Country Village did not preserve any error in the jury charge for our review. *See* Tex.R.App. P. 33.1(a); Tex.R. Civ. P. 272, 274; *Payne*, 838 S.W.2d at 241.

 Generally, when a complaining party has not alerted the trial court of an alleged defect by objecting to the court's charge, it is the charge, and not some other, unidentified law, against which we measure sufficiency of the evidence. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). When a party fails to bring controlling law to the attention of the trial court, as Country Village failed to do here with its arguments regarding article 2.21, that party waives on appeal any argument re-

garding that other law. *See Equistar Chem., L.P. v. Dresser–Rand Co.*, No. 04–0121, —— S.W.3d ——, ——, 2007 WL 1299161 at *3 (Tex. May 4, 2007) (argument that charge submitted improper measure of damages was waived by failure to present to trial court); *Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex.1993) (failure to object to jury questions based on state law waived assertion on appeal that federal maritime law controlled). Furthermore, a broad objection to sufficiency of the evidence, as Country Village asserted below in its motions for judgment notwithstanding the verdict and for a new trial, is generally insufficient to "clearly and distinctly make the trial court aware of a contention" even if that contention is "necessarily encompassed" in the evidentiary objections. *See Equistar Chem.*, —— S.W.3d at ——, 2007 WL 1299161, at *4.

 However, where the claimed error in the charge is the omission of an element of a theory of recovery, rule 279 of the Rules of Civil Procedure "prescribes the consequences for failing to object to that omission." *In re J.F.C.*, 96 S.W.3d 256, 262 (Tex.2002) (applying rule 279 to omission of "best interests of the child" from charge in termination of parental rights case); *see also* Tex.R. Civ. P. 279. If an entire independent ground of recovery is omitted, that ground of recovery is waived. *See* Tex.R. Civ. P. 279; *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex.

*Union* had issued. Country Village points out that a motion for rehearing was pending at the Supreme Court until April 2004, after the trial court's plenary power would have expired; however, it directs us to no authority that the pendency of a motion for rehearing somehow deprives an issued opinion of its precedential value.

**12.** Even if we were to expand our review to include Country Village's motion for new trial and for judgment notwithstanding the verdict, its challenges are again only to the sufficiency of the evidence to support the jury's findings. Similarly, in its motion for judgment notwithstanding the verdict, Country Village asserts that the trial court should disregard the verdict as to questions nine and ten because there was no evidence to support the jury's answers.

1990). If a submitted ground of recovery consists of more than one element, and at least one element is submitted to and found by the jury, the parties are considered to have agreed to waive a jury trial on the elements that were not submitted, and to have submitted those issues to the trial court for resolution. *In re J.F.C.,* 96 S.W.3d at 262–63; *First State Bank, Morton v. Chesshir,* 634 S.W.2d 742, 747 (Tex. App.-Amarillo 1982, writ ref'd n.r.e.). If the trial court does not make written findings on the omitted elements, the court of appeals will deem the omitted elements found in support of the judgment. *In re J.F.C.,* 96 S.W.3d at 262–63; *Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 565 (Tex. 2002).

■ Even though we have held above that Country Village's assertions of charge error were not preserved, we still must address Country Village's assertion that actual fraud is not an omitted element of the Patterson's veil-piercing theories, but instead is a required independent ground of recovery. If actual fraud was an omitted element, then because some essential elements of the Pattersons' theories were presented to the jury without an objection pointing out the omission of actual fraud from question nine, we would deem that omitted element found in support of the judgment so long as there is sufficient evidence to support such a finding. *See* TEX.R. CIV. P. 279; *Ramos,* 784 S.W.2d at 668; *Bencon Mgmt. & Gen. Contracting, Inc. v. Boyer, Inc.,* 178 S.W.3d 198, 205 (Tex.App.-Houston [14th Dist.] 2005, no pet.). Country Village contends, however, that article 2.21 requires submission of common law fraud as an independent ground of recovery, and that such an independent ground is waived because no element thereof was submitted to the jury. *See* TEX.R. CIV. P. 279. If this contention is correct, then *both* of the Pattersons' veil-

piercing theories would fail as a matter of law, because no evidence would support either the jury's finding of fraud under question ten or a deemed finding of fraud under question nine when the Pattersons had not obtained a separate jury finding on common law fraud.

In its briefs to this Court, Country Village cites to a number of cases in which a separate question on fraud *was* presented to the jury, but none of those cases holds that a separate question on fraud was *required* to be presented to the jury. For example, in a supplemental letter brief to this court, Country Village quotes *Southern Union* as stating that "[f]irst, the City used the single business enterprise finding to underpin its *breach of contract* claim. There was no *tort* claim to which the single business enterprise finding could have applied other than the fraud in the inducement claim[.]" *S. Union,* 129 S.W.3d at 88. This quotation, taken in context, does not relate to the necessity of a separate question on fraud; instead, the supreme court was correcting the court of appeals' statement that "[t]o prove that there has been a sham to perpetuate a fraud, *tort* claimants must only show constructive fraud." *Id.* (quoting *Rio Grande Valley Gas Co. v. City of Edinburg,* 59 S.W.3d 199, 209 (Tex.App.-Corpus Christi 2000)) (emphasis added by supreme court). The supreme court was stating that a finding of actual fraud under article 2.21 was necessary because the City of Edinburg's claim sounded in contract, and veil-piercing in contract actions is governed by article 2.21. *See S. Union,* 129 S.W.3d at 88. The supreme court did not hold and has not held that a separate question and finding on common law fraud is a necessary underpinning of a veil-piercing action.

■ Finally, before we evaluate the sufficiency of the evidence to support the verdict and judgment, we must determine

whether we are required only to measure the evidence against the charge as given, *see Osterberg*, 12 S.W.3d at 55, or whether we must review the sufficiency of the evidence to support a deemed trial court finding of actual fraud. *See* TEX.R. CIV. P. 279; *In re J.F.C.*, 96 S.W.3d at 262–63. Generally, if a party fails to bring controlling law to the attention of the trial court, that party waives for the purposes of appeal any argument that other law should govern the charge. *Equistar Chem.*, —— S.W.3d at ——, 2007 WL 1299161, at *3; *Gen. Chem. Corp.*, 852 S.W.2d at 920. More specifically, the Austin Court of Appeals has held that when an article 2.21 complaint is not asserted before the trial court, rule 274 and *Osterberg* require that the sufficiency of the evidence be measured against the trial court charge that was submitted to the jury. *See Nat'l Plan Adm'rs*, 150 S.W.3d at 745; *see also Equistar Chem.*, —— S.W.3d at ——, 2007 WL 1299161, at *3 (quoting TEX.R. CIV. P. 274) ("Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."). Accordingly, because Country Village presented the trial court only with challenges to the legal and factual sufficiency of the evidence to support the Pattersons' Single Business Enterprise and Alter Ego theories, and not with a challenge that article 2.21 controls the proper submission of those theories, we will review the record only for legally and factually sufficient evidence in support of the jury's finding on the law as presented in the charge. *See* TEX.R. CIV. P. 274; *Equistar Chem.*, —— S.W.3d at ——, 2007 WL 1299161, at *4; *Osterberg v. Peca*, 12 S.W.3d at 55.

### E. Sufficiency of the Evidence

Because Country Village failed to preserve its legal contentions for our review, our consideration of its first issue on appeal is limited to the legal and factual sufficiency of the evidence to support the jury's answers to questions nine and ten as presented in the charge.[13]

#### 1. Country Village's Contentions

Country Village asserts that there was no evidence or insufficient evidence of dishonesty or intent to deceive as required by the definition of "actual fraud" that was submitted to the jury. Country Village states that there is nothing dishonest or deceitful about a corporate defendant ceasing operations during the pendency of a lawsuit, as Country Village Homes, Inc., did here. It further asserts that there is nothing fraudulent about having a negative net worth, nor does a negative net worth render a corporate defendant judgment-proof as the Pattersons' expert testified. Country Village also contends that all of the evidence of fraud emphasized by the Pattersons is of events that took place after the events giving rise to the present cause of action, such as the payment of the consulting fee and the shutting down of Country Village Homes, Inc. in favor of Vintage Custom Homes.

Finally, Country Village contends that to prove actual fraud, the Pattersons were

---

13. We note that the definition of actual fraud in jury question ten tracks the definition of actual fraud as defined in the comments of the Pattern Jury Charge on Alter Ego. *See* Comm. on Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 108.2 Cmt. (2006). The Pattern Jury Charge relies on the supreme court's language in *Castleber-ry* that states that actual fraud "involves dishonesty of purpose or intent to deceive." *Castleberry*, 721 S.W.2d at 273 (quoting *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964)). The supreme court also considered similar language in *Southern Union*, and did not require a finding on the elements of common law fraud. 129 S.W.3d at 88.

required to show that the fraud was perpetrated for the direct personal benefit of Schauer. Country Village argues that even though Schauer was the sole stockholder of Country Village Homes, Inc., a judgment against Country Village Homes, Inc., would affect Schauer only indirectly.

## 2. The Pattersons' Response

The Pattersons respond that Schauer's shifting of assets between his various corporations to shield those assets from litigation tends to show dishonesty and deceit on the part of Schauer and the entities he controls. They point to Robert's testimony that Schauer had a pattern of seeking excessive overages, and that Schauer had been sued for similar behavior. The Pattersons also point to the testimony of Schauer's employee, who said that Schauer had a history of charging expenses from one house to another house, and paying personal expenses from corporate accounts. Finally, the Pattersons summarize the testimony of their expert to support the jury's answers to questions nine and ten.

## 3. Single Business Enterprise as Presented in the Jury Charge

 Having reviewed the entire record, we conclude that there is some evidence in support of the jury's finding that the Pattersons proved their Single Business Enterprise theory and that the evidence is not so weak as to render the verdict clearly wrong or manifestly unjust. *See id.* Regarding question nine, Kenneth Miller, the Pattersons' expert, and Schauer himself each gave a point-by-point analysis of the business practices of the corporate appellants. Schauer admitted, and Miller

agreed, that the companies shared common employees, offices, and an accounting firm, that one corporation paid another corporation's employees, and that employees of one corporation rendered services on behalf of another corporation.[14] Furthermore, Betty Morgan testified that she was a common employee for Country Village and Vintage Custom Homes, both Schauer corporations, that she worked out of a common office, and that she did work for Vintage while being paid by Country Village.[15]

Schauer and his accountant disagreed with Miller regarding undocumented transfers of funds or unclear allocations of profits and losses. Schauer and the accountant maintained that the transfers of funds were documented by cancelled checks, and that the allocations of profits and losses were clear from the companies' separate accounting ledgers. Miller contended that checks were insufficient documentation for the transfers between corporations. Specifically, he identified interest-free loans not evidenced by a borrowing agreement, but only by a check with "loan" in the memorandum field. He also stated that transfers for "consulting fees" were unclear allocations of profits and losses. Further relating to the final two factors, Morgan testified that she transferred funds from a project of one corporation to a project of another corporation. We conclude that this evidence supports the jury's finding in its answer to question nine that Country Village and its sibling corporations were "not operated as separate entities, but rather integrate[d] their resources to

---

**14.** The Pattersons concede that Country Village Homes, Inc. and the other entities did not use a common business name, one of the factors from *National Plan Administrators* that the trial court included in its charge to the jury. *Nat'l Plan Adm'rs, Inc. v. Nat'l*

*Health Ins. Co.,* 150 S.W.3d 718, 745 (Tex. App.-Austin 2004, pet. granted).

**15.** Eventually Morgan became an employee of Vintage Custom Homes.

achieve a common business purpose." *See generally Nat'l Plan Adm'rs.,* 150 S.W.3d at 746–47. We also conclude that, viewed neutrally, the evidence is not so weak as to render the verdict clearly wrong or manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We hold that the Pattersons' evidence is both legally and factually sufficient to prove its Single Business Enterprise theory as the theory was presented in the jury charge.

### 4. Actual Fraud as Presented to the Jury

Our review of the evidence is limited to the jury's consideration of actual fraud as it was presented in jury question ten on Alter Ego: that "Schauer caused Country Village Homes, Inc., to be used for the purpose of perpetrating and did perpetrate an actual fraud.... 'Actual fraud' means actions involving dishonesty of purpose or intent to deceive." *See* TEX. BUS. CORP. ACT ANN. art. 2.21 § A(2) and cmt.1996.

■ The Pattersons presented evidence that Schauer caused Country Village to be used for actions involving dishonesty of purpose or intent to deceive. Specifically, Schauer, acting for his company, deceived the Pattersons about the amount that they would be charged for extras. The record shows that the Pattersons sought updates from Schauer and Country Village on the status of the extras. Evidence also shows that at the time Schauer received a $15,000 check from the Pattersons in November 1999, he told them that in addition to that check they would owe no more than an additional $15,000 for extras. Evidence further establishes that when Schauer made that representation, Country Village was already in possession of invoices that it would use to assert a claim for more than $15,000 from the Pattersons for extras.

■ Generally, a prediction of the future will not be held to be fraudulent. *Bryant v. Transcont'l Gas Pipe Line Co.,* 821 S.W.2d 187, 190 (Tex.App.-Houston [14th Dist.] 1991, writ denied). However, a statement about the future that was made with present knowledge that the statement must be false can support a finding of fraud. *See Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726, 728 (Tex.1982) (advertisement for "buy back agreement" where defendant had no present intent to perform under buy-back agreement supported cause of action for fraud); *Stanfield v. O'Boyle,* 462 S.W.2d 270, 270, 272 (Tex.1971) (promise to convey real estate combined with evidence of intent not to perform sufficient to support cause of action for fraud); *Texaco, Inc. v. Phan,* 137 S.W.3d 763, 769 n. 3 (Tex.App.-Houston [1st Dist.] 2004, no pet.). The Pattersons presented evidence that Schauer, as a representative of Country Village, made a representation about the future, and that he had present knowledge that the statement must be false.

In addition, the Pattersons' evidence of Schauer and Country Village attempting to collect a variety of unsupported charges for extras is evidence that supports the jury's determination that Schauer acted with dishonesty of purpose or intent to deceive. Because Country Village's charges for extras varied by more than $50,000, and because Schauer refused until the eve of trial to provide the Pattersons with any foundation for these charges, it can be reasonably inferred that the earlier, higher charges were deceptive.

■ Furthermore, having reviewed the entire record, we conclude that evidence is sufficient to establish that Schauer acted with the mental state required by the jury charge: dishonesty of purpose or intent to deceive. While a party's intent is determined at the time

the party made an alleged misrepresentation, intent may be inferred from the party's actions after the statement is made. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986); *W & F Transp., Inc. v. Wilhelm,* 208 S.W.3d 32, 48 (Tex.App.-Houston [14th Dist.] 2006, no pet.); *Frost Nat'l Bank v. Heafner,* 12 S.W.3d 104, 112 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). Because intent to defraud is not normally susceptible to direct proof, it usually must be proven by circumstantial evidence. *Spoljaric,* 708 S.W.2d at 435; *Heafner,* 12 S.W.3d at 112. "Slight circumstantial evidence" of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of intent to defraud. *Spoljaric,* 708 S.W.2d at 435; *Heafner,* 12 S.W.3d at 112.

Here, an inference of fraudulent intent is supported by the Patterson's evidence of various manipulations of the corporate assets of Schauer's enterprises, of his refusal to provide the Pattersons with documentation to support his claimed charges for extras, and of Robert's testimony that Schauer made a practice of seeking payment for extras far above that which would be justified. Though all occurring after the alleged misrepresentations, this evidence supports an inference that Schauer had the requisite dishonesty of purpose or fraudulent intent at the time the Pattersons contracted with his corporation, Country Village Homes, Inc. Assuming, without deciding, that Country Village is correct that no single piece of the Pattersons' evidence alone supports a finding of actual fraud, we conclude that, taken together, the Pattersons have presented some evidence of actions involving dishonesty of purpose or intent to deceive, and that the evidence is not so weak as to render the jury's verdict clearly wrong or manifestly unjust. *See Cain,* 709 S.W.2d at 176. We hold that the evidence is legally and factually sufficient to support the jury's finding of actual fraud as presented in jury question ten.

### 5. Personal Benefit

Under question ten, the actual fraud also must have been perpetrated for Schauer's direct personal benefit. Having reviewed the entire record, we conclude that legally and factually sufficient evidence establishes that Country Village Homes was used to perpetrate an actual fraud for the personal benefit of Schauer. Schauer, Morgan, and Schauer's accountant all testified that Schauer would pay for personal items such as utility bills and car payments out of his companies' accounts. Schauer was not merely benefitting as a shareholder, as Country Village contends. Instead, he was using Country Village's corporate assets as his own and treating the company as his alter ego, and therefore a fraud for the benefit of Country Village would likewise benefit Schauer.

### F. Conclusion

We conclude that there is more than a scintilla of evidence to support the jury's finding in favor of the Pattersons on their theories of Single Business Enterprise and Alter Ego. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We further conclude that the evidence in support of the jury's findings is not so weak as to render the verdict clearly wrong or manifestly unjust. *See Cain,* 709 S.W.2d at 176. We therefore hold that the evidence is legally and factually sufficient to support the trial court's assignment of joint and several liability against Schauer, B & A Realty, Inc., M.B. Schauer Homes, Inc., and the Schauer Family Trust.

We overrule Country Village's first issue.

## Settlement Offer

In its second issue, Country Village contends that it made a reasonable settlement offer in accordance with the Residential Construction Liability Act (the Act). *See* Act of May 24, 1999, 76th Leg., R.S., ch. 189, 1999 Tex. Sess. Law Serv. 663 (current version at TEX. PROP.CODE ANN. §§ 27.001–.003, 27.004, 27.0042, 27.002 (Vernon Supp.2006) and §§ 27.0031, 27.0041, 27.005–.006 (Vernon 2000)).[16] It states that by complying with the statute, it is entitled to certain limitations on liability.

The Act in force at the time this action accrued stated, in relevant part:

**27.002. Application of Chapter**

(a) this chapter applies to:

(1) any action to recover damages resulting from a construction defect, except a claim for personal injury, survival, or wrongful death or for damage to goods[.]

. . .

(b) To the extent of conflict between this chapter and any other law, including the Deceptive Trade Practices–Consumer Protection Act ... this chapter prevails.

**27.004. Notice and Offer of Settlement**

(b) Within the 45–day period after the date the contractor receives the notice, the contractor may make a written offer of settlement to the claimant.... The offer may include either an agreement by the contractor to repair or to have repaired by an independent contractor at the contractor's expense any construction defect described in the notice and shall describe in reasonable detail the kind of repairs which will be made.

. . .

(f) If a claimant unreasonably rejects an offer made as provided by this section or does not permit the contractor or independent contractor a reasonable opportunity to repair the defect pursuant to an accepted offer of settlement, the claimant:

(1) may not recover an amount in excess of:

 (A) the reasonable cost of the offered repairs which are necessary to cure the construction defect and which are the responsibility of the contractor; or

 (B) the amount of a reasonable monetary settlement offer made under Subsection (n); and

(2) may recover only the amount of reasonable and necessary attorney's fees and costs incurred before the offer was rejected or considered rejected.

(g) If a contractor fails to make a reasonable offer under this section, or fails to make a reasonable attempt to complete the repairs specified in an accepted offer made under this section, or fails to complete, in a good and workmanlike manner, the repairs specified in an accepted offer made under this section, the limitations on damages and defenses to liability provided for in this section shall not apply.

(h) Except as provided by Subsection (f), in a suit subject to this chapter the claimant may recover only the following damages proximately caused by a construction defect:

---

**16.** Although the legislature amended the Act in 2003, this present cause of action accrued prior to those amendments. We therefore refer to the Act's earlier language. *See* TEX.

PROP.CODE ANN. § 27.002 historical note (Vernon Supp.2006) ("changes ... apply only to a cause of action that accrues on or after the effective date of this act.").

(1) the reasonable cost of repairs necessary to cure any construction defect, including any reasonable and necessary engineering or consulting fees required to evaluate and cure the construction defect, that the contractor is responsible for repairing under this chapter;

(2) the reasonable expenses of temporary housing reasonably necessary during the repair period;

(3) the reduction in market value, if any, to the extent the reduction is due to structural failure; and

(4) reasonable and necessary attorney's fees.

. . .

(j) An offer of settlement made under this section that is not accepted before the 25th day after the date the offer is received by the claimant is considered rejected.

. . .

(k) . . . The trier of fact shall determine the reasonableness of an offer of settlement made under this section.

## 27.006. Causation

In an action to recover damages resulting from a construction defect, the claimant must prove that the damages were proximately caused by the construction defect.

**17.** The Jury answered no to the question "Was Country Village Homes, Inc.'s letter of December 29, 2000, a reasonable written offer of settlement to Robert and Sherry Patterson?" There was no objection to the form or content of this question.

**18.** The Jury answered yes to the question "Was the failure, if any, of Country Village Homes, Inc., to comply with a warranty a producing cause of damages to Robert and Sherry Patterson?" "Producing cause" was defined as "an efficient, exciting, or contribut-

Act of May 24, 1999, 76th Leg., R.S., ch. 189, 1999 Tex. Sess. Law Serv. Ch. 663 (amended 2003).

Country Village contends that the evidence was legally and factually insufficient to support the jury's finding in question five [17] that the settlement offer made by Country Village was not reasonable. It further asserts that under the Act, "stigma" damages were unavailable unless the settlement offer was unreasonable, or if the stigma was a result of "structural failure." Finally, it states that because the settlement offer was reasonable, jury question number seven [18] does not support liability, since it requires a "producing cause" rather than the "proximate cause" required by the Act.[19]

The Pattersons assert that the law and the evidence support the jury's finding that the settlement offer was unreasonable, and that the jury's award of damages was therefore not limited by the Act. They further assert that because Country Village did not object to the form or content of the jury charge, any complaint about the appropriate causation is waived.

### A. Reasonableness

■■■■ All of Country Village's sub-issues stem from one question: whether the evidence was legally and factually sufficient to support the jury's finding that Country Village's letter of December 29, 2000 was not a reasonable settlement offer for the purposes of the Act. In the letter, Coun-

ing cause that, in a natural sequence, produced the damages, if any. There may be more than one producing cause." There was no objection to the form or content of this question.

**19.** Country Village refers to question seven as "a DTPA question." The jury was not charged on the Deceptive Trade Practices–Consumer Protection Act claim that had been pleaded by the Pattersons.

try Village stated that it would "repair or cause to be repaired all of such items except as expressly included below to the reasonable satisfaction of the Pattersons." The exemptions included the slanted exterior column and the slope on the upstairs floor. The letter also stated that nothing would be done to the porte-cochere except to paint some wood that had become exposed. The letter also required that the Pattersons agree to pay the charges that Country Village was seeking for unpaid extras.

The Pattersons agreed that the offer was acceptable with respect to most of the matters contained therein. However, at trial and on appeal, they point to the fluctuating charges for extras and Country Village's refusal to provide any documentation in support of those charges as reasons why it would not be reasonable to take Country Village at its word for the amount of extras that were owed. Furthermore, Robert offered an extensive explanation of why the offer "glossed over" repairs that he felt were important, including the sloping floor and the porte-cochere. We also note that the Pattersons testified that Country Village's roofer made repeated attempts to repair leaks in the roof, with little or no success. We further note that the final arbiter of "reasonableness" suggested by the letter was an inspector who had a long history of working with Schauer, and who inspected the home repeatedly during construction. We conclude that the jury was presented with sufficient evidence from which it could conclude that the offer was unreasonable, both in the repairs it offered and the requirements it imposed on those repairs.

Country Village directs our attention to three cases examining the sufficiency of the evidence to sustain or reject a jury's finding on the reasonableness of a settlement offer. *See Gentry v. Squires Const.,* *Inc.,* 188 S.W.3d 396, 409 (Tex.App.-Dallas 2006, no pet.) (evidence sufficient to support finding that offer was reasonable); *Perry Homes v. Alwattari,* 33 S.W.3d 376, 385 (Tex.App.-Fort Worth 2000, pet. denied) (evidence sufficient to support finding that offer was not reasonable); *Roubein v. Marino Home Builders, Inc.,* No. 13–01–711–CV, 2002 WL 1765579, at *4–5 (Tex.App.-Corpus Christi August 1, 2002, pet. denied) (not designated for publication) (evidence sufficient to support finding that rejection of offer was unreasonable). Country Village compares the facts of the present case to the facts of the earlier opinions and suggests that these comparisons require us to determine that the jury's finding was incorrect as a matter of law. However, we note that in all these cases, the courts' opinions affirm the findings below; in none of the cases does the appellate court substitute its judgment for that of the fact-finder. *See Gentry,* 188 S.W.3d at 409 ("It is clear the . . . challenge is actually an attack on the weight and credibility assigned to the evidence by the trial court. We will not substitute our judgment for that of the trier of fact as to the credibility of the witnesses."); *see also Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003).

We conclude that there is evidence that supports the jury's finding that Country Village's offer of settlement under the Residential Construction Liability Act was not reasonable. We also conclude that Country Village has not shown the evidence to be so weak as to render the jury's verdict clearly wrong or manifestly unjust. We hold that the evidence is legally and factually sufficient to support the jury's answer to question five.

**B. Remaining issues**

We reach neither of Country Village's remaining sub-issues relating to the Act—that stigma damages are unavailable and

that the jury was not properly charged on the causation the Act requires—because they presume that the settlement offer was reasonable, and because we have found the evidence to be legally and factually sufficient to support the jury's finding that the offer was not reasonable. We overrule Country Village's second issue.

### Liability and Damages

In its third issue, Country Village contends that the evidence is legally and factually insufficient to support the jury's answers on breach of contract, on breach of warranty, and on damages. Specifically, Country Village asserts that:

- under the law governing breach of contract, only difference-in-value damages are available to the Pattersons, and not cost-of-repair damages;
- while the record contains evidence of the value of the house had there been no defects, there is no evidence concerning the value of the house as constructed but not repaired, and therefore difference-in-value damages could not be calculated;
- the breach of warranty claim fails because the contract warranted only that Country Village would construct the house "substantially in compliance with the plans and specifications selected and in accordance with good building practices," because the contract disclaimed implied warranties, and because it is impossible to determine what warranty the jury found was violated;
- the parties' experts disagreed about the nature of the defects in the house, and the dispute was such that the evidence is rendered factually insufficient to support the jury's verdict;
- the Pattersons' experts' lump sum estimate of cost of repair is insufficient because there is no way to deduct the cost of repair of defects that are not supported by evidence; and
- the evidence of stigma damages is too speculative or conclusory to sustain the verdict.

The Pattersons respond first that Country Village's attacks on the underlying legal theories have not been preserved—neither in objections to the evidence, nor in objections to the charge, nor in the motion for judgment notwithstanding the verdict, nor in the motion for new trial. They further contend that even if these arguments are preserved, the legal theories are correct. Finally, they assert that the evidence as to liability and damages is legally and factually sufficient.

### A. Preservation of Error

The Pattersons are correct that Country Village presented none of its legal theories to the trial court. Country Village neither directs us to where error was preserved, nor presents us with any argument or authority suggesting that we may review these arguments absent such preservation. *See* Tex. R. Civ. P. 272, 274; Tex.R.App. P. 33.1. We therefore review only those arguments that relate to sufficiency of the evidence.

### B. Sufficiency of the Evidence

Country Village raises a number of distinct evidentiary points relating to liability and damages. We address each in turn.

#### 1. Warranty

Country Village's first evidentiary point is that there is no evidence of any express warranty outside the contract, and that an implied warranty is unavailable by the terms of the contract. It further states that under *Crown Life Insurance Co. v. Casteel,* because there is no way to determine which warranty the jury found to be violated we must reverse this claim. *See* 22 S.W.3d 378, 388 (Tex.2000). The

Pattersons respond that Country Village made no *Casteel* objection to the trial court, that the waiver of warranty was premised on a valid "H.B.W. Warranty" that was never obtained by Country Village, and that there was no valid waiver of the implied warranty of good and workmanlike performance.

The contract states that Country Village agreed to build the home "substantially in compliance with the plans and specifications selected and in accordance with good building practices." It further states that "Seller to furnish H.B.W. Warranty, and there are no oral agreements, representations, conditions, or warranties, expressed or implied, other than those written in this contract." Schauer testified that he never supplied the Pattersons with any homeowner's warranty because the warranty company he used went bankrupt while the house was being built. He did not inform the Pattersons that there was no homeowner's warranty.

In question seven, the jury was asked:

Was the failure, if any, of Country Village Homes, Inc., to comply with a warranty a producing cause of damages to Robert and Sherry Patterson?

. . . .

"Failure to comply with a warranty" means either of the following:

a. Failing to comply with an express warranty.

An express warranty is any affirmation of fact or promise made by Country Village Homes, Inc., that relates to the construction of the Pattersons' home and becomes part of the basis of the bargain. It is not necessary that formal words such as "warrant" or "guarantee" be used or that there be a specific intent to make a warranty.

OR

b. Failing to perform services in a good and workmanlike manner.

A good and workmanlike manner is that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work.

The jury answered yes to this question. Country Village made no objection to the form or content of the question. We therefore agree with the Pattersons that Schauer did not raise any objection that asserted that either of these definitions was invalid. *See* TEX.R.APP. P. 33.1. The jury's answer is therefore valid if supported by either definition of failure to comply with a warranty.

### 2. Condition of the House

 Country Village contends that there is factually insufficient evidence to support either the breach of warranty or breach of contract claims because liability "turns upon the competing opinions of the experts and evidence concerning the condition of the home including photographs." In its brief, it reviews the testimony of experts from both sides and concludes that the evidence is factually insufficient to support the jury's answers regarding Country Village's failure to substantially comply with its contract and warranties with the Pattersons. The Pattersons respond that Country Village raises only questions of weight and credibility, which are the province of the jury and are not grounds for reversal in a factual sufficiency review.

In question six, relating to breach of contract, the jury was asked:

Did Country Village Homes, Inc., fail to substantially comply with the contract?

Substantial compliance means that the essential elements of the contract have been performed such that the work is substantially completed.

The jury answered yes. Country Village did not object to the form or content of the question.[20]

Country Village presented the testimony of a number of engineers and construction professionals, all of whom stated that the Pattersons' house, while not perfect, is not of sufficiently poor quality to merit a finding of liability. These experts presented explanations for the problems with the concrete, the porte-cochere, the sloping second floor, the leaking roof, the brick facade, the stone pillars, and the out-of-alignment windows.

However, the Pattersons presented their own experts, who testified that the problems were far greater than Country Village's experts would concede, and that the house required drastic repairs. Among other problems, the Pattersons' experts described severe structural defects that would require removal and replacement of the roof and the beams that make up the second floor. The kitchen tiling and the exterior brick would need to be removed and replaced.

Country Village concedes that the evidence regarding the condition of the house depends largely on the opinions of experts. It is not for us to determine which set of witnesses was more credible. *See Golden Eagle Archery,* 116 S.W.3d at 761. We conclude that the evidence is factually sufficient to support the jury's finding of liability for breach of contract and breach of warranty.

### 3. Repair Damages

**20.** Jury question 7, relating to Country Village's breach of warranty, is reproduced

Country Village maintains that the expert testimony regarding what repairs are necessary and how much these repairs will cost is legally and factually insufficient to support the jury's award of damages. It contends that because the Pattersons' engineer did not prepare an itemized estimate of costs of the repairs he prescribed, and because the CEO of the Pattersons' preferred repair company based his estimates on the engineer's recommendations and also did not itemize costs, this expert testimony cannot meet the Pattersons' burden to prove the repair costs are reasonable and necessary. They further contend that a lump sum estimate is insufficient because it does not enable the jury to deduct any amount for a defect which it finds to be unsupported by evidence. The Pattersons respond that the experts' testimony was detailed and specific, and that Knight stated that the dollar amount was reasonable and necessary. The Pattersons do not answer Country Village's argument regarding the inherent insufficiency of a lump sum estimate.

In question eight, the jury was asked:

What sum of money, if paid now in cash, would fairly and reasonably compensate Robert and Sherry Patterson for their damages, if any, that resulted from the conduct you found in response to Question No. 6 and/or Question No. 7?

. . .

a. The necessary and reasonable cost to repair the property.

The jury answered "$300,000.00." Country Village did not object to the form or content of the question.

 It is not necessary to use the words "reasonable" and "necessary" to establish the right to recover costs of repair.

above.

*Ebby Halliday Real Estate, Inc. v. Murnan*, 916 S.W.2d 585, 589 (Tex.App.-Fort Worth 1996, writ denied). However, the Pattersons' engineer testified that he believed $300,000 to be a "reasonable" figure to repair the Pattersons' house, and he also acknowledged that it was "necessary" to repair the house. He testified specifically to the repairs he believed to be needed, and why he believed that they were needed, although he did not break down the total to assign specific costs to specific repairs. The engineer's $300,000 figure was taken from an itemized estimate based on his recommended repairs that had been prepared by the CEO of the Pattersons' preferred repair company. The engineer was not cross-examined on the reasonableness and necessity of repair, only on the accuracy of his opinion.

The CEO of the repair company testified that he prepared the $300,000 estimate based on the engineer's report, some other, minor reports, and an independent evaluation of the Pattersons' house. He further stated that there was no lesser repair that would put the property in the condition in which it was supposed to be when it was first built. He stated that if someone agreed to pay him $363,414, he would do all the work described by the engineer. He stated that his company had not yet been hired by the Pattersons.

We conclude that this testimony is legally and factually sufficient for the jury to determine the necessity and reasonableness of the recommended repairs. The authority which Country Village cites to the contrary is distinguishable as involving no evidence of reasonableness. *See Perry Homes v. Alwattari*, 33 S.W.3d 376, 385 (Tex.App.-Fort Worth 2000, pet. denied) (proof of necessity and payment not evidence that payment was reasonable); *Ebby Halliday*, 916 S.W.2d at 589 ("Mere proof of amounts charged or paid does not raise an issue of reasonableness and such amounts ordinarily cannot be recovered without evidence showing the charges were reasonable"; mere evidence that homeowners believed repairs generally were necessary is no evidence that specific work was necessary); *GATX Tank Erection Corp. v. Tesoro Petroleum Corp.*, 693 S.W.2d 617, 619–20 (Tex.App.-San Antonio 1985, writ ref'd n.r.e.) (mere proof of payment not evidence that payment was reasonable). Here, evidence from expert witnesses establishes that all repairs are necessary and why they are necessary, the reasonableness of the costs, and how the experts compiled the costs. Furthermore, Country Village has pointed to no authority in support of its contention that lump sum estimates are by definition insufficient as a matter of law; its authority shows only that a lump sum estimate is not sufficient to merit reversal of a jury finding of zero damages. *See Fort Worth Hotel, Ltd. v. Enserch Corp.*, 977 S.W.2d 746, 762 (Tex.App.-Fort Worth 1998, no pet.).

We conclude that legally and factually sufficient evidence supports the jury's award of repair damages.

#### 4. Stigma Damages

Country Village contends that the jury's award of stigma damages is unsupported because, as its appraiser testified, calculations of stigma are purely theoretical exercises. It also asserts that absent evidence of an offer to purchase their home at a reduced price, the Pattersons presented no evidence of stigma. The Pattersons respond that stigma is recognized by Texas courts. They point out that their realtor and their appraiser both testified to the effect of stigma on market value, and that their appraiser set the market value of the house if repairs were made at $575,000.

In question eight, the jury was asked:

What sum of money, if paid now in cash, would fairly and reasonably compensate Robert and Sherry Patterson for their damages, if any, that resulted from the conduct you found in response to Question No. 6 and/or Question No. 7?

. . .

b. The difference, if any, as of June 21, 2000, between the fair market value of the subject property assuming proper construction and no defects and the fair market value of the subject property assuming that all repairs have been satisfactorily completed and discounting the property for stigma associated with the defects[.]

The jury answered "$250,000.00." Country Village did not object to the form or content of the question.

 Stigma damages are allowed by Texas courts. *See Perry Homes,* 33 S.W.3d at 385; *Smith v. Levine,* 911 S.W.2d 427, 434 (Tex.App.-San Antonio 1995, writ denied). The Pattersons' appraiser explained his methodology, and described the houses to which he compared the Pattersons' house.[21] Country Village's objections go to the weight and credibility of his testimony as weighed against that of its own appraiser. Once again, in our review of sufficiency of the evidence we may not invade the province of the jury in evaluating weight and credibility of witnesses. *See Golden Eagle Archery,* 116 S.W.3d at 761. The jury was entitled to rely on the testimony of the Pattersons' appraiser over Country Village's appraiser. *See id.* We hold that the evidence is legally and factually sufficient to support the jury's award of stigma damages.

---

**21.** No objection was made to the admissibility of the stigma damage theory, nor was there any *Havner*-like objection as to the validity of the underlying economic theory. *See Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706,

We overrule Country Village's third issue on appeal.

## Incomplete Record

In its fourth issue, Country Village asserts that it is entitled to a new trial because of defects in the reporter's record that has been filed with this Court. *See* Tex.R.App. P. 34.6(f). Under Rule 34.6(f), an appellant is entitled to a new trial:

(1) if the appellant has timely requested a reporter's record;

(2) if, without the appellant's fault, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed or—if the proceedings were electronically recorded—a significant portion of the recording has been lost or destroyed or is inaudible;

(3) if the lost, destroyed, or inaudible portion of the reporter's record, or the lost or destroyed exhibit, is necessary to the appeal's resolution; and

(4) if the lost, destroyed or inaudible portion of the reporter's record cannot be replaced by agreement of the parties, or the lost or destroyed exhibit cannot be replaced either by agreement of the parties or with a copy determined by the trial court to accurately duplicate with reasonable certainty the original exhibit.

*Id.* The parties agree that Country Village timely requested the reporter's record and that Country Village is not at fault regarding any remaining flaws in the record.

---

709 (Tex.1997); *see also Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998) (requiring objection to preserve error under *Havner* ).

In April 2006, following numerous proceedings regarding the state of the record in this appeal, this Court determined that a complete reporter's record had not been filed. We remanded to the trial court for a hearing, and findings and rulings to determine:

(1) whether any exhibits have been lost or destroyed;

(2) the number and type of exhibits that have been lost or destroyed;

(3) whether the lost or destroyed exhibits are necessary to the appeal's resolution;

(4) if the court finds that exhibits have been lost or destroyed, whether any duplicate copies of the exhibits exist which could be substituted into the record;

(5) if the court finds that the exhibits have been lost or destroyed, whether such destruction was the appellant's fault; and

(6) if the court finds that the exhibits have been lost or destroyed:

(a) whether the lost or destroyed exhibits can be replaced by agreement of the parties; or

(b) with duplicate copies determined by the trial court to accurately duplicate with reasonable certainty the original exhibits.

*See* TEX.R.APP. P. 34.6(f)(1), (2), (4). We expressed no opinion as to whether the exhibits in question were necessary to the resolution of this appeal.

The trial court held the hearing that we ordered, and in June 2006 entered the following findings of fact and conclusions of law:

Among the exhibits into which the court of appeals inquired specifically are plaintiff's exhibit 22 and defense exhibit 181. Concerning those exhibits, this court finds: (1) that both have been lost;

(2) that plaintiff's exhibit 22 was a videotape and defense exhibit 181 was a cancelled check; (3) that neither is necessary to the appeal's resolution; (4) that duplicate copies of both exhibits exist and can be substituted into the record; (5) that neither of the exhibits [was] lost through any fault of the appellants; and (6) that both exhibits can be replaced with duplicate copies that this court has determined to accurately duplicate with reasonable certainty the original exhibits.

The duplicate exhibits with which plaintiff's exhibit 22 and defense exhibit 181 can be replaced were exhibits 1 and 2 to the hearings this court held on April 10 and 24. This court sends those two exhibits to the court of appeals along with these findings and transcripts of the two hearings. Exhibit 1 is a videotape that is a reasonably accurate duplicate of the videotape admitted at the trial of this cause as plaintiff's exhibit 22. Exhibit 2 is a reasonably accurate photocopy of the cancelled check admitted at the trial of this cause as defense exhibit 181.

The court of appeals also inquired specifically about defense exhibits 49 and 50. This court has determined that those two exhibits were not lost or at least, like the wretch in *Amazing Grace*, "once [were] lost, but now [are] found." Exhibit 49 is a sewer pipe that this court labeled and admitted as exhibit D–3 at the hearing on April 10. Defense exhibit 50 was also some type of plumbing pipe. According to the evidence adduced at the hearings in April, the staff of the 55th District Court found two unlabeled pipes in [the court reporter's] office that might have been exhibit 50— a yellow pipe and a copper pipe. Based on the testimony of Ms. Manson and Mr. Reese at the hearing on April 10, this

court finds that the yellow pipe, labeled and admitted at that hearing as exhibit D–4, is the pipe admitted at trial as defense exhibit 50. Along with these findings and the transcripts of the April hearings, this court sends to the court of appeals exhibits D–3 and D–4.

At a hearing on April 10, counsel for the appellants noted that he believed that plaintiff's exhibits 20, 21, 23, 24, 25, 26, and 27 were also missing from the record [the court reporter] sent to the court of appeals. The court recessed the hearing on April 10 and directed counsel for appellees to determine whether any duplicates existed of plaintiff's exhibits 20, 21, 23, 24, 25, 26, and 27. Based on the evidence adduced at the hearing on April 24, 2006, this court makes the following findings concerning plaintiff's exhibits 20, 21, 23, 24, 25, 26, and 27:(1) that all seven original exhibits have been lost; (2) that all seven were photographs or collections of photographs; (3) that none of them is necessary to the appeal's resolution; (4) that duplicate copies of exhibits 25, 26, and 27 exist and can be substituted into the record, but that no exact duplicates exist of exhibits 20, 21, 23, and 24; (5) that none of the exhibits was lost through any fault of the appellants; and (6) that exhibits 25, 26, and 27 can be replaced with duplicate copies that this court has determined to accurately duplicate with reasonable certainty the original exhibits, but exhibits 20, 21, 23, and 24 cannot.

At the hearing on April 24, this court labeled and admitted as exhibit D–5 the photographs this court determined to be accurate duplicates of plaintiff's exhibits 25, 26, and 27. The court sends exhibit D–5 to the court of appeals along with these findings and the transcripts of the two hearings.

The court respectfully recommends that the court of appeals accept exhibits 1, 2, D–3, D–4, and D–5 to the April hearings as sufficient to complete the reporter's record in this cause.

(emphasis added; footnotes deleted.)

■■■ The trial court found that black-and-white photocopies of exhibits 20, 21, 23, and 24 that were present in the appellate record did not accurately duplicate the original exhibits. The evidence supports the trial court's finding. The photographs sent to this Court by the trial court following the April 24 hearing bear an electronic date stamp of August 13, 2003. That date matches the electronic date stamps apparent on photocopies of photographs previously identified as exhibit 25, and does not match the date stamps on photocopies previously provided to this Court and identified as exhibits 20, 21, 23, and 24. The photographs sent to this Court after the April 24 hearing do not appear to be adequate copies of exhibits 20, 21, 23, and 24. As found by the trial court, the record before us is incomplete.[22]

Country Village challenges the trial court's conclusion that exhibits 20, 21, 23, and 24 are unnecessary to the resolution of this appeal. Country Village contends that because it is challenging the legal and factual sufficiency of the evidence, we are required to review the entire record, and anything less than the entire record requires an automatic remand for a new trial. Further, Country Village states that

22. The parties dispute whether Country Village should be bound by its concession at the April 24 hearing that certain photographs provided by the Pattersons' attorney's assistant were adequate copies of exhibits 20, 21, 23, and 24. The trial court, however, apparently was not persuaded by the concession because it found that the copies were inadequate.

the particular exhibits are necessary for this Court to evaluate the condition of the home, which was at issue both for liability and damages. Country Village further states that the black-and-white photocopies in our original record are insufficient to evaluate a factual sufficiency complaint. Relying on the opinion of the Fourteenth Court of Appeals, Country Village states that because it has been denied a "complete and unquestionably accurate record on appeal," we are required to reverse and remand. *See Owens–Illinois, Inc. v. Chatham*, 899 S.W.2d 722, 733 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd).

Additionally, Country Village contends that certain evidence was "mishandled" in that the trial court failed to send certain exhibits to the jury room for deliberations, and in allowing certain exhibits that were not in evidence to go to the jury. Country Village suggests that these purported errors, combined with the Pattersons' attorney's unobjected-to characterizations of Schauer as a "crook" or "crooked," amount to "cumulative error" that would require us to grant a new trial.

The Pattersons assert that since the only issue under the standard of review is "whether there is any evidence more than a scintilla to support the findings," the photographs—even if they support Country Village's position and undercut the jury's findings—are irrelevant to a determination of whether a scintilla *supports* those findings. Also, the Pattersons contend that the doctrine of cumulative error is without merit because there is no reversible error and therefore nothing to cumulate, and because the "archaic" doctrine is contrary to the current rules of appellate procedure relating to reversible error and preservation of error.

### A. Exhibits 20, 21, 23, and 24

Although it asserts that a new trial is automatic when a factual sufficiency challenge is made on a record that is incomplete, Country Village cites to authority that pre-dates the current Rule 34.6(f) of the rules of appellate procedure. *See Town of Flower Mound v. Teague*, 111 S.W.3d 742, 766–67 (Tex.App.-Fort Worth 2003, pet. denied) (distinguishing former rule 50(e), which did not take into consideration whether lost or destroyed portion of record was necessary to resolution of appeal). Upon this Court's direction, the trial court held a hearing and determined that the missing exhibits were not necessary to the resolution of the appeal. We agree.

The photographs that the trial court found to be missing from the record were referred to repeatedly in Country Village's case-in-chief. Schauer and Country Village's experts all made use of the photographs in explaining how the problems with the house are either non-existent or merely cosmetic and easily repaired. However, Robert specifically addressed the photographs, stating that the house "looks great when you are looking at it from photos and videos. You can't really get a feeling for the problems that are on it." He also contended that the photographs were taken from angles that failed to reveal the problems with the house. We conclude that this treatment of the photographs by both sides indicates that a review of the photographs by this Court is not necessary to our resolution of this appeal. Both sides concur that the photographs do not reveal any problems with the house. They disagree instead about the import of the photographs. This is a question of weight and credibility of the evidence, which remains the sole province of the jury, even when we review the evidence for factual sufficiency. *See Golden Eagle Archery*, 116 S.W.3d at 761. We hold that the absence of exhibits 20, 21, 23, and 24 does not hinder our review of the

sufficiency of the evidence, and therefore that the exhibits are not necessary to this appeal.[23]

## B. Mishandling of Exhibits

Country Village contends that the trial court was required to send all evidence into the jury room, and that based on the reporter's record submitted to this Court, the trial court failed to do so. *See* Tex.R. Civ. P. 281. Country Village also contends that certain exhibits not in evidence were permitted to go to the jury. The Pattersons do not respond to these assertions in their brief to this Court.

▮ Rule 281 states that "the jury may, and on request shall, take with them in their retirement ... any written evidence...." Tex.R. Civ. P. 281. Despite the permissive language of the rule—"may, and on request shall"—the supreme court has held not only that the rule is mandatory, but also that it "is self-operative and requires no request from the jurors or counsel." *First Employees Ins. Co. v. Skinner,* 646 S.W.2d 170, 172 (Tex. 1983). If the rule is violated, we then review the record for harm. *See id.* at 172–73 (reviewing court is to evaluate whole case to determine whether denying jury opportunity to examine exhibits "was reasonably calculated to cause and probably did cause the rendition of an improper judgment"); *Formosa Plastics Corp., USA v. Kajima Int'l, Inc.,* 216 S.W.3d 436, 464 (Tex.App.-Corpus Christi 2006, pet. filed); *Cruz v. Hinojosa,* 12 S.W.3d 545, 550 (Tex. App.-San Antonio 1999, pet. denied); Tex. R.App. P. 44.1(a)(1); Tex.R. Civ. P. 281.

▮ Similarly, where exhibits that have not been admitted into evidence are allowed into the jury room, we review such error for harm. *See Mid–South Bottling Co. v. Cigainero,* 799 S.W.2d 385, 388 (Tex.App.-Texarkana 1990, writ denied) ("question on appeal ... is whether the jury's verdict probably resulted directly from the presence of a part of the deposition in the deliberation room"). For example, such error is not reversible if there is no evidence that the jury considered the improper exhibits, or if the exhibits are cumulative. *See Annesley v. Tricentrol Oil Trading, Inc.,* 841 S.W.2d 908, 911–12 (Tex.App.-Houston [14th Dist.] 1992, writ denied) (trial court erred by allowing into jury room 50–page exhibit of which only two pages were admitted, but error was harmless because appellant failed to show that jurors considered additional pages), abrogated on other grounds by *Van Allen v. Blackledge,* 35 S.W.3d 61 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Harvey v. Culpepper,* 801 S.W.2d 596, 601 (Tex.App.-Corpus Christi 1990, no pet.) (where deposition improperly allowed into jury room, no harm where deposition "presented the jury with no new information and added nothing substantive for the jury to consider").

▮ Country Village complains that plaintiff's exhibits 26 and 27 and defense exhibits 176, 177 and 181 were not delivered to the jury. It further contends that defense exhibits 30, 44–47, 175, and 178, none of which were admitted, were impermissibly allowed into the jury room. Of these, Country Village proffers an argument of harm regarding only defense exhibit 175. We hold that because Country Village has not presented any argument as to plaintiff's exhibits 26 and 27 and defense exhibits 20, 44–47, and 176–78, any error relating to these exhibits is inadequately

---

**23.** We note that if we assume that the missing exhibits show—as Country Village asserts—that the house has not changed over the years and therefore does not suffer from structural defects, then the 2003 photographs in our possession would be substantively identical to the missing exhibits, and therefore cumulative of evidence already in the appellate record.

briefed, and therefore waived. *See* Tex. R.App. P. 38.1(h) (brief must contain clear and concise argument for contentions made).

▇▇▇ Exhibit 175 is a computer document that the Pattersons' trial counsel stated was created by Betty Morgan, the former employee of Country Village Homes, Inc. and Vintage Homes. It bears the subject line "Payroll[,]" is dated April 25, 2002, and states: "Kay, Monte called at 9:35am said to move eveything [sic] to vintage including payroll, and he said anything comes in for dove manor charge it to sandown[.]" In his argument to the trial court in support of Exhibit 175's admission, the Pattersons' trial counsel stated that the document would support the assertion that Schauer transferred all the assets of Country Village Homes, Inc. to other corporations during the pendency of the present case. We hold that Exhibit 175, having not been admitted into evidence by the trial court, should not have been given to the jury in its deliberations. We further hold that the trial court's error was harmless, because it is cumulative of Morgan's deposition testimony and Miller's live testimony and because Country Village has not identified anything in the record that shows that the jury considered the unadmitted document. *See Annesley,* 841 S.W.2d at 911–12; *Harvey,* 801 S.W.2d at 601.

## C. Cumulative Error

▇▇▇ Finally, Texas courts recognize the doctrine of cumulative error, wherein a reviewing court may reverse a lower-court judgment when the record shows a number of instances of error, "no one instance being sufficient to call for a reversal, yet all the instances taken together may do so." *Sproles Motor Freight Lines, Inc. v. Long,* 140 Tex. 494, 168 S.W.2d 642, 645 (1943); *see also Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 840 (Tex.1979);

*Smerke v. Office Equip. Co.,* 138 Tex. 236, 158 S.W.2d 302, 305 (1941); *Nat'l Freight, Inc. v. Snyder,* 191 S.W.3d 416, 424 (Tex. App.-Eastland 2006, no pet.); *Univ. of Texas at Austin v. Hinton,* 822 S.W.2d 197, 205 (Tex.App.-Austin 1991, no pet.). However, Country Village's contention that the doctrine applies to errors "unobjected to or otherwise" that taken together would lead to improper judgment is incorrect. In the first supreme court case to which it cites, the court found error to be preserved without prompt objection when error was made; however, error was still presented to the trial court by a motion for new trial. *See Smerke,* 158 S.W.2d at 305. The court held that a party is not required "to take a chance on prejudicing his cause with the jury by making the objection," but nowhere did it hold that the complaining party is excused from ever presenting error to the trial court. *See id.; see also Cook v. Sabio Oil & Gas, Inc.,* 972 S.W.2d 106, 112 (Tex.App.-Waco 1998, pet. denied) (complaint of cumulative error "not preserved for appellate review because the ground now asserted for mistrial was not presented to the trial court").

▇▇▇ Country Village contends that the Pattersons' trial counsel twice referred to Schauer as "crooked" or "a crook," and that even unobjected-to, this error should be cumulated with any other error that we might find to be harmless, and would thus merit reversal. Country Village never raised this specific objection to the trial court, nor did it raise any objection of cumulative error. We hold that Country Village has failed to preserve any complaint of cumulative error.

We overrule Country Village's fourth issue on appeal.

## Extras

▇▇▇ In its fifth issue, Country Village contends that the evidence is legally and factually insufficient to support the

jury's finding on question number one that Country Village did not install any "extras" for which it was not compensated. It contends that the Pattersons' evidence is conclusory, and cannot overcome Schauer's direct testimony and the documentary evidence that shows that the Pattersons owed approximately $32,000. The Pattersons respond that their expert's testimony was sufficient evidence to create a fact issue for the jury.[24]

Country Village points specifically to the following evidence:

- Schauer offered documents and gave testimony that detailed the overages;
- the evidence showed Country Village was due $31,833.33;
- Robert acknowledged the extras and acknowledged that payment was required;
- Robert testified that he does not know what is owed;
- The Pattersons' expert did not go into any detail regarding his determination that Country Village owed the Pattersons $12,900.

The Pattersons' expert, Kenneth Miller, testified that he examined several boxes of documents produced in discovery to determine the validity of the charges and that the Pattersons owed nothing. Indeed, he testified that his analysis showed that the Pattersons had overpaid Country Village by $12,900. He explained to the jury the procedure he used to analyze the documents.

 We note first that Country Village's assertions under this issue (as well as the Pattersons' responses thereto) primarily address the weight and credibility of witness testimony, the evaluation of which is the sole province of the jury. *Golden Eagle Archery, Inc.,* 116 S.W.3d at 761. Furthermore, a jury's award of damages is legally sufficient when the award falls within the range of damage amounts for which evidence has been presented at trial. *KMG Kanal–Muller–Gruppe Deutschland GmbH & Co. KG v. Davis,* 175 S.W.3d 379, 396 (Tex.App.-Houston [1st Dist.] 2005, no pet.). Country Village presented some evidence that the Pattersons owed nearly $32,000 for extras, and had at times sought even more; on the other hand, the Pattersons' expert testified that Country Village owed nearly $13,000 for the Pattersons' overpayments. The jury's finding of zero damages for extras falls within the range of evidence presented. We therefore hold that the evidence is legally sufficient to support the jury's finding. *See KMG,* 175 S.W.3d at 396. We further hold that Country Village has not shown the evidence to be so weak as to render the jury's verdict clearly wrong or manifestly unjust, or against the great weight and preponderance of the evidence. We overrule Country Village's fifth issue.

### Conclusion

We affirm the judgment of the trial court.

---

**24.** The Pattersons further contend that Country Village's contention that Kenneth Miller's expert testimony was conclusory is not properly raised for the first time on appeal. "When [a] challenge is restricted to the face of the record—for example, when expert testimony is speculative or conclusory on its face—then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility." *Twin City Fire Ins. Co. v. Vega–Garcia,* 223 S.W.3d 762, 771 (Tex.App.-Dallas 2007, pet. filed). Country Village's challenge is a no-evidence challenge, asserting that Miller's testimony is no evidence against Country Village's claim for extras, and is preserved for appeal.