Opinion issued February 7, 2008















Opinion issued February 7,
2008

 

 

 

 

 

 

 

 








 

 








 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 

NO.   01-07-00057-CV

AMERICAN HERITAGE, INC., d/b/a 

THE GILLMAN GROUP, Appellant

V.

NEVADA GOLD & CASINO, INC., Appellee

and

NEVADA GOLD & CASINO, INC., Appellant

V.

FRED GILLMAN, Appellee

 



On Appeal from the 234th District Court

Harris County, Texas

Trial Court Cause No. 2003-51378


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 








O P I N I O N

 



          American Heritage, Inc., d/b/a The
Gillman Group (American Heritage) appeals the judgment against it in this
breach of contract case, contending that, under Nevada law: (1) Nevada Gold
& Casino, Inc. (Nevada Gold) lacks standing to assert its claims; (2) the
trial court erred in granting Nevada Gold’s motion for judgment notwithstanding
the verdict on rescission, improperly disregarding the jury’s finding that
American Heritage returned everything of value to Nevada Gold; (3) the damages
award in favor of Nevada Gold is not supported by legally sufficient evidence;
and (4) the trial court erred in awarding prejudgment interest.  In its cross-appeal, Nevada Gold contends
that, under Texas
law, the trial court erred in granting American Heritage’s motion for j.n.o.v.
on alter ego, improperly disregarding the jury’s finding that Fred Gillman
(Gillman) is responsible for American Heritage’s conduct.  We conclude that Nevada Gold has standing to
assert its claims, legally sufficient evidence supports the damages award, and
the trial court did not err in granting j.n.o.v. on American Heritage’s rescission
claim and Nevada Gold’s alter ego claim. 
We further conclude that Nevada
law precludes an award of prejudgment interest in this case.  We therefore modify the judgment to delete
the award of prejudgment interest and, as modified, affirm.  

 

Background

          This
case arises out of an agreement to finance and develop a casino on tribal lands
in New Mexico.  American Heritage had expertise in the gaming
industry and helped various Native American tribes throughout the United States
open and operate casinos.  Its expertise
led to negotiations with the Pueblo of Laguna Tribe to develop a large casino,
to be named the “Route 66 Casino.” 
American Heritage and the tribe’s development corporation entered into
various contracts in which American Heritage agreed to provide consulting
services, lease gaming equipment, and provide financing for the casino.  

In early 2002, after the tribe opened
and began earning a profit at a temporary casino on the future site of the
Route 66 Casino, American Heritage began discussions with Nevada Gold about
funding for the casino project.  Nevada
Gold is a developer and operator of gaming facilities and other lodging and
entertainment sites, and also has experience working with Native American tribes.  American Heritage and Nevada Gold entered
into a contract, entitled the Amended and Restated Operating Contract (the
operating contract), to form a limited liability corporation (LLC).  In the operating contract, Nevada Gold agreed
to use its best efforts to pursue financing for the casino project in exchange
for essentially half of the net profits that American Heritage would receive
under its contracts with the tribal development corporation.  

Nevada Gold provided American
Heritage $250,000 cash, secured by a promissory note that was convertible into
equity in the LLC, in furtherance of its obligations under the contract. Within
a month of signing the contract, American Heritage notified Nevada Gold that
the tribe was considering the possibility of self-financing, but left Nevada
Gold to continue pursuing financing so that funds would be in place by the
November 2002 closing date for the project. 
In September 2002, however, American Heritage notified Nevada Gold that
the tribe had decided to self-finance, and that Nevada Gold could no longer
participate in the casino project. 
American Heritage continued with the project without Nevada Gold.  

The Route 66 Casino opened about a
year later.  After approximately two
years of profitable operations, American Heritage sold its interest in the
casino to the tribe for $12.1 million.   

Nevada Gold instituted an arbitration
proceeding against American Heritage near the end of September 2002.  It also demanded that American Heritage
return the funds it provided that were secured by the promissory note.  American Heritage repaid the note with
interest.  Soon afterward, Nevada Gold
brought this suit against American Heritage in Harris County,
seeking its contractual profit.  

After several weeks of trial, the
jury found that American Heritage breached the operating contract, and it
awarded $8.3 million to Nevada Gold.  The
jury also responded affirmatively to the question whether American Heritage had
“returned everything of value [it] received from Nevada Gold” under the
contract, and that Gillman was individually responsible for the actions of
American Heritage.  After considering the
parties’ post-verdict motions, the trial court entered judgment on the jury’s
verdict in favor of Nevada Gold and awarded prejudgment interest on that
amount.  The trial court granted Nevada
Gold’s motion for j.n.o.v. on the jury’s finding that Nevada Gold returned
everything of value, and granted Gillman’s motion for j.n.o.v. on the jury’s
finding that he was responsible for American Heritage’s conduct.  The parties timely appealed.                                                                                                                                                                                                                                                  
                                                                                                   

Discussion

I.                             
Standing

 

Before reaching the merits of its
appeal, American Heritage challenges Nevada Gold’s standing.  Standing, a necessary component of subject
matter jurisdiction, is a constitutional prerequisite to maintaining a suit
under Texas
law.  Tex. Ass’n of Bus. v. Tex.
Air Control Bd., 852 S.W.2d 440, 444 (Tex. 1993). 
A standing defect cannot be waived, and can be raised for the first time
on appeal. Id. at 445–46.  A party’s standing to pursue a cause of
action is a question of law we review de novo. Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 928 (Tex. 1998). 


“A plaintiff has standing when
it is personally aggrieved, regardless of whether it is acting with legal
authority . . . .”  Nootsie, Ltd. v. Williamson County Appraisal Dist., 925 S.W.2d 659,
661 (Tex.
1996).  Specifically, a plaintiff has
standing to sue if: (1) the plaintiff has sustained, or is immediately in
danger of sustaining, some direct injury as a result of a complained-of
wrongful act; (2) there is a direct relationship between the alleged injury and
the claim asserted; (3) the plaintiff has a personal stake in the controversy;
(4) the challenged action has caused the plaintiff some injury in fact; or (5)
the plaintiff is an appropriate party to assert both its own interest and the
public interest in the matter.  El Paso Cmty.
Partners v. B & G/Sunrise Joint Venture, 24 S.W.3d 620, 624 (Tex. App.—Austin 2000,
no pet.).  

A party to a contract has standing to
maintain a suit on the contract.  Interstate
Contracting Corp. v. City of Dallas, 135
S.W.3d 605, 618 (Tex.
2004).   American Heritage contends that
Nevada Gold has no standing to sue on the contract because the contract contemplates
an LLC, which supplants any right Nevada Gold has to seek relief under the
contract.  Thus, American Heritage
contends, Nevada Gold might be able to bring a derivative suit against American
Heritage on behalf of the limited liability company, but it has no standing
individually.  We disagree.  A limited liability company member may have
an individual action against a defendant for a claim that the defendant has
breached a contractual duty owed directly to the shareholder, individually.  Wingate
v. Hajdik, 795 S.W.2d 717, 719 (Tex. 1990)
(quoting Mass. v. Davis, 168 S.W.2d
216, 222 (Tex.
1942)).   The nature of the alleged wrong indicates
whether the individual or solely the company has standing.  Redmon
v. Griffith, 202 S.W.3d 225, 234 (Tex. App.—Tyler 2006, pet. denied)
(citing Faour v. Faour, 789 S.W.2d
620, 621–22 (Tex. App.—Texarkana 1990, writ denied)).

Nevada Gold lacks standing as a
derivative shareholder because American Heritage’s breach of the contract
barred Nevada Gold from procuring any interest in the LLC.  American Heritage’s contention, as applied to
these facts, is tantamount to saying that an individual who contracts with
another party to purchase shares of a corporation and then is prevented by that
party’s breach from completing the purchase must sue as a derivative
shareholder.  The parties’ agreement
belies this contention.  The operating contract
expressly recognizes that each member owes duties to the other and provides for
the possibility that a member may take legal action against another Member
“arising between them out of this Agreement.” 
Nevada Gold’s suit against American Heritage falls within this
description.  Accordingly, we conclude
that we have subject matter jurisdiction over Nevada Gold’s claims.  

II.      Choice of Law—Nevada 

The operating contract between American
Heritage and Nevada Gold expressly calls for the application of Nevada law.  Both parties confirm that Nevada substantive law controls their
claims.  We apply Texas procedural law in addressing
the issues raised in this appeal.  Nexen Inc. v. Gulf Interstate Eng’g Co.,
224 S.W.3d 412, 417 (Tex. App.—Houston [1st Dist.] 2006,
no pet.).  

III.    Rescission

 

American Heritage claims that,
because the jury answered “yes” to the question whether American Heritage returned
everything of value received under the contract and the evidence supports the
jury’s finding, the trial court erred in granting Nevada Gold’s motion for
j.n.o.v.  Instead, American Heritage
contends, the trial court should have concluded from the jury’s finding that Nevada
Gold had rescinded the contract, and thus was precluded from seeking benefit of
the bargain damages by its pre-suit conduct. 
We review this challenge to the propriety of the trial court’s j.n.o.v. under the legal sufficiency standard.  See City
of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005); Harris v. McFerren,
788 S.W.2d 76, 78 (Tex. App.—Houston [1st Dist.] 1990, writ denied).  Under this standard, we view the evidence in
a light most favorable to the jury’s verdict, and indulge every reasonable
inference in its support, reversing only if the evidence does not allow
reasonable and fair-minded people to reach the verdict under review.  City of
Keller, 168
S.W.3d at 823–24, 827.  

          Nevada law on rescission

In Great American Insurance Co. v. General Builders, Inc., the Nevada
Supreme Court explained that:

Rescission may be accomplished in one of two
ways:  In what is called “legal rescission,” a party, in response to a
material breach on the part of the other party or for other valid reasons,
unilaterally cancels the contract;
alternatively, in what is known as “equitable rescission,” the aggrieved party brings an action in a court with
equitable jurisdiction asking the court to nullify the contract.  

 

934 P.2d 257, 262 (Nev. 1997).[1]  The trial court’s question to the jury derives from language
set forth in Bergstrom
v. Estate of DeVoe, 854 P.2d 860 (Nev. 1993).  In Bergstrom,
the plaintiff, not the defendant, pleaded for the equitable remedy of
rescission of the contract.  The Nevada
Supreme Court explained that if parties partially perform a contract and one
party breaches, the non-breaching party may elect to return everything of value
it received under the contract and thereby rescind the contract.  854 P.2d at 861.  Bergstrom
does not address whether or how a party may invoke rescission as an affirmative
defense, as American Heritage attempts here.

American Heritage does
not use rescission in either way recognized under Nevada law. 
Rather, it advances rescission as if it is akin to the affirmative
defense of accord and satisfaction.  Regardless
of the label that American Heritage attaches to its affirmative defense—whether
rescission or accord and satisfaction—under Nevada law, it must prove the existence of a
mutual agreement to extinguish any rights arising under the original contract.  See Bates
v. Chronister, 691 P.2d 865, 869 (Nev.
1984) (explaining that, “[f]or a subsequent agreement to constitute a rescission,
it must be made with the mutual consent of the parties to the original contract”) (emphasis in original); see Restatement (Second) Contracts § 283.[2]  Section 283 of the Restatement provides:        

(1)            
An agreement of
rescission is an agreement under which each party agrees to discharge all of
the other party’s remaining duties of performance under an existing contract.

 

(2)            
An agreement of
rescission discharges all remaining duties of performance of both parties.  It is a question of interpretation whether
the parties also agree to make restitution with respect to the performance that
has been rendered.  

 

Restatement
(Second) Contracts § 283.  The Restatement further explains that “[c]onsideration
is provided by each party’s discharge of the duties of the other.  This is so even though one or both parties
have partly performed their duties or one or both have a claim for damages for
partial breach.”  Id.
at cmt. a.  

As with any binding
agreement, the evidence must objectively manifest an agreement to rescind.  Our Texas Supreme Court in Texas Gas Utilities Co. v. Barrett, like
the Nevada high
court in Bergstrom, relies on the
rule of rescission as defined by Professor Corbin in observing that: 

parties may rescind their contract
by mutual agreement and thereby
discharge themselves from their respective duties.  The mutual release of the rights of the
parties is regarded as a sufficient consideration for the agreement. . . . 
[E]xpressions of assent are usually in the form of an offer by one and an
acceptance by the other and an operating agreement of rescission
can be made tacitly as well as expressly. 

 

460 S.W.2d 404, 414 (Tex. 1970) (citing Arthur
Linton Corbin,
5A Corbin on Contracts § 1236, at 542 (1964)); see Bergstrom, 854 P.2d at 861.   

          Effect of the jury’s finding 

The question submitted to the jury
did not ask whether Nevada Gold and American Heritage mutually agreed to
rescind the contract.  American Heritage
contends that the finding that it returned to Nevada Gold everything of value
received under the contract required the trial court to conclude as a matter of
law that the contract was rescinded. 
Based on our understanding of Nevada
law, we disagree with American Heritage’s contention that the question as
submitted sufficed to submit the issue of rescission to the jury.  

The question tendered by
American Heritage and submitted to the jury tracks language from Bergstrom, which views rescission as an
equitable remedy.  See 854 P.2d at 861; see also
Awada v. Shuffle Master, Inc.,   ___
P.3d ___, 2007 WL 4532521, at *5 (Nev. Dec. 27, 2007) (concluding that trial court did not abuse its discretion by rescinding parties’ agreement because
substantial evidence supported finding of fraud in inducement).   For purposes of our analysis, therefore, we
interpret American Heritage’s request as one for equitable relief. 

Under Texas procedure, the jury may decide
ultimate issues of fact, but the trial court ultimately decides whether
equitable relief is appropriate.  See Indian Beach
Property Owners’ Ass’n v. Linden, 222 S.W.3d
682, 690 (Tex. App.—Houston [1st Dist.] 2007, no pet.).  Its decision to grant or deny equitable
relief is a matter of discretion, subject to reversal only on a showing of
abuse.  See id. at 690–91.  “An abuse of discretion occurs if the trial court (1) acts
arbitrarily and unreasonably, without reference to guiding rules or principles,
or (2) misapplies the law to the established facts of the case.”  Id. at
691.  

Here, the trial court did not abuse
its discretion in declining to grant American Heritage’s request for equitable
rescission.  First, as the trial court
observed, the question answered by the jury does not provide a sufficient
factual basis to award rescission under Nevada
law because it does not inquire whether the parties mutually consented to
forego their rights under the contract.[3]   See Great Am. Ins. Co., 113
Nev. at 354,
934 P.2d at 262.  American Heritage did
not point either the trial court or this court to any Nevada authority recognizing an equitable
claim for rescission on behalf of a defendant under comparable
circumstances.  

Second, the record does not contain legally
sufficient evidence that Nevada Gold, either explicitly or implicitly, agreed
to discharge American Heritage’s remaining duties under the agreement when it
demanded satisfaction of the promissory note, and the jury made no such
finding.  In pointing to Nevada Gold’s
demand for return of the promissory note in isolation, American Heritage
overlooks the fact that Nevada Gold already had instituted an arbitration
proceeding seeking benefit of the bargain damages before it made the demand.[4]  There is no evidence that Nevada Gold offered
to dismiss the arbitration proceeding or agreed not to pursue this civil action
if American Heritage returned the funds. 
To the contrary, given Nevada Gold’s unflagging persistence in pursuing
its legal remedies to hold American Heritage accountable for breaching its
obligations under the contract, a reasonable juror could not find that Nevada
Gold agreed to abandon its rights under the contract in exchange for payment of
the promissory note, even had the jury been asked to decide the matter.  

Instead, Nevada Gold’s
demand for return of the funds is reasonably construed as an effort to mitigate
its damages.  Pertinent to American
Heritage’s challenge, Professor Corbin, an authority that the Nevada Supreme
Court relied on in Bergstrom, has
noted the difference between rescission and mitigation in an earlier edition of
his treatise:  

When one party repudiates the contract, that
repudiation discharges the other party from any further duty to perform under
the contract.  That party may try to
avoid or reduce injury by contracting elsewhere for substitute material or
service, demanding his money back or the reconveyance of his property . .
. .  In doing these things, he is trying
to avoid harms and losses; he is not offering a “rescission,” or “waiving” his
rights or “electing” a remedy.  These are
things that the injured party can do, but they are clearly distinguishable.

  

Corbin on
Contracts § 1237 (1 vol.
ed. 1952).  The Texas Supreme Court’s
reasoning in Barrett endorses the
same distinction.  In that case, the
petitioner gas company sued a former lessee of a farm for breach of contract
based on his failure to make payments. 
The respondent lessee contended that the gas company rescinded the
contract by continuing to provide gas to the property but billing the property
owner-lessor for the service.  The Court
disagreed, reasoning that:

the act of petitioner in billing the
owner-lessor Thompson for gas subsequently delivered to the farm, and the success
of petitioner in replacing the repudiated contract with later ones of similar import, all payments under
which have been credited to respondents for the period in question, is not
conduct indicative of assent to a rescission.  It was the duty of petitioner to mitigate its losses and its doing so
was favorable to respondents.  

 

Barrett, 460
S.W.2d at 415.   

          Here,
because American Heritage repudiated the contract, Nevada Gold was entitled to mitigate
its damages.  In fact, it had the burden
to do so.  See Conner v. So. Nev. Paving, 741 P.2d 800, 801 (Nev. 1987) (stating that, “[a]s a
general rule, a party cannot recover damages for loss that he could have
avoided by reasonable efforts”), quoted
in Sheehan & Sheehan v. Nelson Malley & Co., 117 P.3d 219, 226
(Nev. 2005).   Given that American Heritage had already
repudiated the contract by informing Nevada Gold it could no longer
participate, Nevada Gold had no reason or obligation to act as if American
Heritage would use the funds to Nevada Gold’s benefit in furtherance of the contract.  See Schwartz v. Wasserburger,
30 P.3d 1114, 1116 n.5 (Nev.
2001) (observing that “when one party engages in anticipatory breach, the other
party may treat the contract as ended and sue immediately”). 

          In summary, American Heritage’s reliance on Bergstrom and the jury’s finding to
contend that the trial court abused its discretion in failing to rescind the
agreement pursuant to its equitable power is misplaced.  Rather, as the Nevada Supreme Court noted in Bates, rescission requires mutual
consent.  Although an aggrieved party to
a contract may seek equitable rescission as a remedy, like the party in Bergstrom, we conclude that a breaching
party must show mutual agreement to rescind before relying on equitable
rescission to foreclose a non-breaching party’s remedies at law.  Accordingly, we conclude that the trial court did not err in
disregarding the jury’s finding or abuse its discretion in declining to uphold
Nevada Gold’s rescission defense.   

          Election of remedies

          American Heritage also claims that, by demanding return of
the promissory note, Nevada Gold made an irrevocable election of remedies and,
once American Heritage complied with that demand, Nevada Gold could not recover
under the benefit of the bargain measure of damages found by the jury and
awarded in the judgment.  This claim does
not comport with Nevada
law concerning the election of remedies. 
See J.A. Jones Constr. Co. v.
Lehrer McGovern Bovis, Inc., 89 P.3d 1009, 1017 & n.16 (Nev. 2004) (holding
that plaintiff is not required to elect between theories of recovery before
obtaining jury verdict because trial court can determine whether judgment on
verdict would result in duplicate recovery). 
Nevada has endorsed the Restatement’s rule that, “[i]f a party has more
than one remedy . . ., his manifestation of a choice of one of them by bringing
suit or otherwise is not a bar to another remedy unless the remedies are
inconsistent and the other party materially changes his position in reliance on
the manifestation.”  Restatement (Second) Contracts § 378, cited in Mackintosh v. Cal.
Fed. Sav. & Loan Ass’n, 113 Nev. 393,
404, 935 P.2d 1154, 1161 (Nev.
1997).  The Restatement explains that a
change of position is “material” only when all of the circumstances indicate that
a shift in remedies would be unjust.  Restatement (Second) Contracts § 378
cmt. a.  American Heritage has neither
alleged nor proved such a change of position here.[5]   

IV.    Damages

      Next, American
Heritage contends that the trial court erred in entering judgment on the jury’s
finding of damages because Nevada Gold did not provide competent evidence to
support the award.  Specifically,
American Heritage urges that the judgment should be reversed because the jury’s
damages award (1) does not follow the proper measure of damages in the court’s
charge; (2) is not supported by proper expert testimony; and (3) includes
speculative damages.  After discussing
Nevada Gold’s damages evidence, we address each contention in turn.  

          A.      Nevada Gold’s evidence of damages

At trial, Nevada Gold put on evidence
of its damages through its former chief financial officer, Christopher Domijan.  Domijan testified that while employed at
Nevada Gold, he was responsible for its financings and keeping financial
records.  To arrive at a net lost profits
figure, Domijan used American Heritage’s financial reports
from the casino project.  Domijan also
relied on his recollection of the parties’ discussions relating to projected
expenses, and Nevada Gold’s overhead expenses saved because it did not
participate in the project.  American
Heritage’s financial documents reported the revenues it actually earned and the
expenses it actually charged to the casino project after it went forward
without Nevada Gold.  Domijan accepted these
revenues figures, but identified certain expenses American Heritage had charged
to the project that he testified should not have been charged.  Overall, Nevada Gold would not have approved
approximately $1.6 million of the total expenses American Heritage charged to
the project.  On the other hand, Domijan
also adjusted the expense figure upward to include the 30% of the cost of
overhead previously incurred by American Heritage that the parties had agreed
to charge back to the project, and accounted for the 50% of the expenses
charged to the project which Nevada Gold had agreed to pay.  

          Domijan further testified that Nevada Gold was to have
taken over the accounting books for the joint venture and would have had some
nominal accounting and travel expenses to split with American Heritage.  Domijan reduced the actual profits by Nevada
Gold’s capital contributions and adjusted the expenses to reflect the same
amount, thus leaving a net profit.  On
cross-examination, Domijan conceded that he did not deduct any amount for state
or federal taxes because profits would have been distributed through the LLC on
a pre-tax basis.  

In
addition to American Heritage’s net profits from operating the casino, Domijan
considered American Heritage’s eventual sale of the project to the tribe.  Ultimately, Domijan testified that the casino
project yielded a net profit of $17.5 million to American Heritage, of which
fifty percent, or $8.75 million, constituted net profits Nevada Gold lost as a result
of American Heritage’s breach.   

          B.      Benefit
of the bargain

          American
Heritage first contends that the damages awarded do not follow the measure of
damages submitted in the court’s charge. 
The charge asked the jury to find the “sum of money, if any, if paid now
in cash, [that] would fairly and reasonably compensate Nevada Gold for its
damages, if any, that resulted from American Heritage’s failure to comply” with
the contract.  It further instructed the
jury that “Nevada Gold is entitled to all sums which Nevada Gold would have received
had American Heritage complied” with the contract.  

“[I]n a
breach-of-contract case, the normal measure of damages is just compensation for
the loss or damage actually sustained, commonly referred to as the benefit of
the bargain,” which may include reasonably certain lost profits.    Bowen v. Robinson, 227 S.W.3d 86, 96 (Tex. App.—Houston
[1st Dist.] 2006, no pet.).  The question
submitted to the jury, which tracks the Texas
pattern jury charge question on contract damages,[6] is an
accurate statement of law, but does not constrain the jury to decide the amount
of damages under any particular formula. 


American
Heritage did not object to the damages submission, but nevertheless cites to
the operating contract language as providing the only proper measure of
damages.  In particular, American
Heritage relies on provisions that declare that it and Nevada Gold were to
distribute cash flow from operations at their discretion, and would reimburse
each other through the LLC only for related expenses that they both
approved.  Domijan’s testimony is
consistent with these provisions.  

American
Heritage asserts that, because of managerial discretion and the need for joint
approval, Domijan could not have relied on personal knowledge in testifying
about distributions made and expenses approved, making his testimony
necessarily speculative.  We understand American Heritage’s argument to be that the
evidence is legally insufficient to support the jury’s damages finding because
those damages allegedly contained lost profits that were not sufficiently
proved, and address it accordingly.  See Bowen, 227 S.W.3d at 95.  

                   1.       Evidentiary
standard for proof of lost profits 

When a plaintiff is prevented from
performing a contract, “lost profits are generally an
appropriate measure of damages so long as the evidence
provides a basis for determining, with reasonable
certainty, what the profits
would have been had the contract
not been breached.”  Eaton
v. J. H., Inc., 581 P.2d 14, 17 (Nev. 1978).  The “party seeking damages has the burden of providing the court with an evidentiary
basis upon which it may properly determine the amount of damages.”  Frantz
v. Johnson, 999 P.2d 351, 360 (Nev. 2000)
(citing Mort Wallin v. Comm’l Cabinet,
784 P.2d 954, 955 (Nev.
1989)).   Damages need not,
however, “be proven with mathematical exactitude, and [] the mere fact that
some uncertainty exists as to the actual amount of damages sustained will not preclude recovery.”  Id.

 Generally, a plaintiff may recover lost profits if it can show a history of
profitability or the actual
existence of future contracts from which lost profits can be calculated with reasonable certainty.  See, e.g., Eaton, 581 P.2d at 17.  The mere fact that the breached agreement
contemplated a new business with no prior history of
profits, however, does not bar recovery under a lost profits measure as too
speculative, uncertain, or remote.  “The
rule barring recovery of uncertain lost profits is directed against
‘uncertainty as to the existence of (profits) rather than as to measure or
extent.’”  Gen. Elec. Supply Co. v. Mt. Wheeler Power, Inc., 587 P.2d
1312, 1313 (Nev. 1978) (quoting Fireman’s Fund Ins. v. Shawcross, 442
P.2d 907, 912 (Nev.
1968)).  

2.       Domijan’s testimony

American
Heritage’s challenge, in part, concerns whether Domijan could provide competent
testimony concerning the reasonableness of expenses.  American Heritage posits that Nevada Gold
could not prove its damages through Domijan because he lacked personal
knowledge concerning what had transpired in the casino project as reflected in
American Heritage’s financial documents, and also lacked specialized knowledge
concerning what would have been appropriate expenditures under the contract.    

Under Rule 701 of the Texas Rules of Evidence, a lay witness may testify to opinions or inferences
rationally based on that witness’s perception and helpful to a clear
understanding of the witness’s testimony or the determination of a fact issue.  Tex. R.
Evid. 701.  Pertinent to this
case, Texas courts regularly allow business owners or officers to testify as
lay witnesses, based on knowledge derived from their position, about what they
had reasonably anticipated from the business activities they were prevented
from undertaking as a result of  another
party’s breach.  See Nat’l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of N. Am.,
955 S.W.2d 120, 131–32 (Tex. App.—Houston [14th Dist.] 1997), aff’d sub nom. Keck, Mahin &
Cate v. Nat’l Union Fire Ins. Co. of
Pittsburgh, Pa., 20 S.W.3d 692 (Tex. 2000); Ishin Speed Sport, Inc. v. Rutherford, 933 S.W.2d 343, 352 (Tex.
App.—Fort Worth 1996, no writ).[7]  “A new business owner’s opinion of its lost profits may have probative value even though the estimate is based
on knowledge of a previous
similar business and the
underlying business records are
not introduced.”  Ishin Speed Sport, Inc., 933 S.W.2d at 352.  

Domijan based
his calculations and conclusions on the actual revenues American Heritage
received after cutting Nevada Gold from the project, and the expenses that he,
as the financial representative for Nevada Gold, would have accepted as
reasonable under the contract.  Domijan testified
that, as Nevada Gold’s CFO, he had previous experience securing financing for
the gaming industry and was authorized to make financial decisions for the
company.  Based on personal knowledge
derived from this experience, Domijan provided admissible testimony about the
amount of net profits Nevada Gold could have reasonably anticipated.  Domijan’s business experience with Nevada
Gold equipped him to conclude that, but for American Heritage’s breach, Nevada
Gold could have reasonably anticipated receiving approximately half of the net
profits actually earned by the casino project, as the operating contract
provides.  See Jeaness v. Besnilian, 706 P.2d 143, 146 (Nev.
1985) (finding excluded partner entitled to recover half of net profits
realized by partner running business as sole owner after breaching partnership
agreement).  The fact that Domijan
could not have personal knowledge concerning the admitted, actual revenues because
Nevada Gold did not participate in the project did not prevent him from using American
Heritage’s financial data as a basis for determining Nevada Gold’s lost
profits.  

Furthermore,
the fact that Domijan used American Heritage’s financial statements as a basis
for calculating Nevada Gold’s reasonably anticipated lost profits did not
require him to wholesale adopt the expenses documented by those financial
statements.  For example, Domijan
deducted the expenses incurred by American Heritage in connection with this
litigation, opining that Nevada Gold would not have agreed to charge them to
the project.  This opinion is consistent
with the contract’s indemnification provision, which requires each member to
“indemnify the Company, each Manager, and each other Member and hold them
harmless from and against all losses, costs, liabilities, damages, and expenses
(including, without limitation, costs of suit and attorney’s fees) they may
incur on account of any breach of that Member of this Agreement.”  Based on his personal knowledge and
experience handling financial affairs for Nevada Gold, Domijan could provide
admissible testimony concerning expenses that Nevada Gold would have accepted
or rejected.  American Heritage was free
to challenge the reasonableness of Domijan’s conclusions on
cross-examination.  Disputes about
particular parts of expenses, and whether or not they reasonably should be
charged against the project, are matters affecting the weight and credibility
of the testimony, not its overall admissibility.  See
Holt Atherton Indus. Inc. v. Heine, 835 S.W.2d 80, 84 (Tex.
1992); Texaco, Inc. v. Phan, 137
S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.).  

American
Heritage also complains that, because the contract expressly confers the
authority to approve expenses on H. Thomas Winn, Nevada Gold’s CEO, the jury
could not have found that Winn would have delegated that responsibility to
Domijan.  We disagree.  Domijan testified
that he would have been responsible for reviewing and approving expenses to be
charged to the project.  This
evidence permitted the jury to reasonably find that Winn would have appointed
CFO Domijan as his agent to exercise the authority to approve or reject
expenses on behalf of Nevada Gold.   

American
Heritage further asserts that Nevada Gold’s evidence of lost profits resulting
from the sale of the casino project is speculative because Domijan testified
that Nevada Gold would not have agreed to the buyout.  This testimony appears in the plaintiff’s
bill of exception and, thus, the jury did not hear it.  See
Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 577 (Tex. 2006) (explaining
that “[t]he purpose of a bill of exceptions is to allow a party to make a
record for appellate review of matters that do not otherwise appear in the
record, such as evidence that was excluded,” and holding that court of appeals could not consider testimony from bill of
exceptions without having first determined, pursuant to properly assigned
error, that trial court erred in refusing to admit testimony).  Because the trial court did not admit the
testimony, no error could have resulted from it.  

Under the circumstances presented,
Domijan’s testimony did not overstep the line separating reasonably anticipated
lost profits from impermissible speculation. 
We therefore hold that, under Nevada
law, legally sufficient evidence supports the jury’s contract damages finding
in favor of Nevada Gold.  

V.      Prejudgment interest

American
Heritage next contends that the trial court erred in awarding prejudgment
interest to Nevada Gold.  Nevada law generally provides that, absent a contractual
provision fixing a different rate of interest, “interest must be allowed at a
rate equal to the prime rate at the largest bank in Nevada . . . on January 1 or July
1, as the case may be, immediately preceding the date of the transaction, plus
2 percent, upon all money from the time it becomes due
. . . .”  Nev. Rev.
Stat. § 99.040(1).  In a
contract case, 

[t]he amount of money to which the interest rate will be
applied must be determined by the following factors: (1) if the contract
breached provides for a definite sum of money, that sum; (2) if the performance
called for in the contract, the value of which is stated in money or is
ascertainable by mathematical calculation from a standard fixed in the contract
or from established market prices of the subject matter, that sum.  

Paradise Homes, Inc. v. Cent. Sur. & Ins. Corp., 437 P.2d 78, 83 (Nev. 1968). 
Accordingly, the propriety of an award of prejudgment interest depends
on whether a definite amount is stated, can be ascertained from information
contained within the four corners of the contract, or can be calculated through
possible reference to an established market price.  Comparing the contract in this case with
other Nevada
cases, we do not find any of these characteristics present.  See Hornwood v. Smith’s Food King No. 1, 807 P.2d 208, 214 (Nev.
1991); Jeaness, 706 P.2d at
147.  Although the contract contains
information for allocation of profits, it does not direct calculation of any
sum certain, either standing alone or by reference to any market price.[8]   Moreover, the contract does not identify any
date that would serve for commencing the running of interest, and no figure was
available until the jury awarded damages. 
In such circumstances, Nevada
law does not allow recovery for prejudgment interest.  See Hornwood, 807 P.2d at
214; Jeanness, 706 P.2d at 147.  

VI.    Nevada Gold’s appeal on alter
ego

 

          In its sole issue on appeal, Nevada Gold challenges the
trial court’s ruling granting Gillman’s j.n.o.v., disregarding the jury’s
finding that Gillman is individually liable for American Heritage’s
conduct.  Specifically, Nevada Gold
contends that legally sufficient evidence supports the jury’s finding of legal
unity between Gillman and American Heritage, and that Gillman used American
Heritage to perpetrate a fraud on Nevada Gold for his personal benefit.  

          The
charge instructed the jury that Gillman was responsible for American Heritage’s
conduct if:

American
Heritage was organized and operated as a mere tool or business conduit of Fred
Gillman; there was such unity between American Heritage and Fred Gillman that
the separateness of American Heritage had ceased and holding only American Heritage
responsible would result in injustice; and Fred Gillman caused American Heritage
to be used for the purpose of perpetuating [sic] and did perpetuate [sic] an
actual fraud on Nevada Gold primarily for the direct personal benefit of Fred
Gillman.

With respect to the unity element,
the charge further instructed the jury to consider the total dealings of
American Heritage and Fred Gillman, including:

1.                
The degree to
which American Heritage’s property had been kept separate from that of Fred
Gillman;

2.                
The amount of
financial interest, ownership, and control Fred Gillman maintained over
American Heritage; and

3.                
Whether American
Heritage had been used for the personal purposes of Fred Gillman.[9]  

(Id.)
 Thus, we
analyze whether the evidence of these three factors presented at trial “would
enable reasonable and fair-minded people to reach the verdict under review.”  City of
Keller, 168
S.W.3d at 827.

In determining whether a unity
between corporation and individual exists, Texas courts consider the totality of the
circumstances, including: 

(1)     payment of alleged corporate debts with
personal checks or other commingling of funds, 

(2)
    representations that the individual
will financially back the corporation, 

(3)
    diversion of company profits for the
individual’s personal use, 

(4)
    inadequate capitalization, and 

(5)
    other failures to keep corporate and
personal assets separate.

Country Village Homes, Inc. v. Patterson, 236 S.W.3d 413, 428
(Tex. App.—Houston
[1st Dist.] 2007, pet. filed).  In asserting that Gillman and
American Heritage had such unity that the separateness of American Heritage had
ceased, Nevada Gold directs us to the following evidence: 

·                   
Gillman
identified himself as “the owner and the boss” of American Heritage; 

·                   
Gillman testified
that, because American Heritage is a subchapter S corporation, “everything
flows through” American Heritage to him; 

·                   
American Heritage
does business as “The Gillman Group”;  

·                   
Gillman
personally guaranteed one loan and provided another to American Heritage;

·                   
Nevada Gold issued
stock purchase warrants to Gillman individually; 

·                   
American Heritage
paid insurance for luxury cars owned by Gillman.  

We agree with the trial court that
these facts do not amount to more than a scintilla of evidence to support a
finding of unity.  Concerning Gillman’s
role as CEO and sole shareholder, “[a] showing that
an individual is an officer, director, or majority shareholder is insufficient
to support a finding of [a]lter [e]go.”  Country Village Homes, Inc., 236 S.W.3d
at 428.   Nor do we find his description
of the S corporation’s function sufficient to support a finding of unity.  Although personal loans to a corporation may
support a finding of unity, courts typically cite to this factor in conjunction
with proof of inadequate capitalization, which is not present here.  See,
e.g., id. at 436 (holding that
evidence was legally and factually sufficient evidence to support finding that corporation
was used to perpetrate actual fraud for personal benefit of individual
defendant where most or all of corporate assets had been transferred to another
company belonging to individual defendant, individual defendant would pay for
personal items such as utility bills and car payments out of companies’
accounts); Sparks v. Booth, 232
S.W.3d 853, 869 (Tex. App.—Dallas 2007, no pet.) (holding that evidence was
legally sufficient to support trial court’s implied finding of alter ego where
individual testified he was president, secretary, sole shareholder, and sole director of bankrupt corporation, personally
rented office building to corporation, and that corporation had no assets
because it was subchapter S corporation
so all benefits and detriments flowed to him); Hoffmann v. Dandurand, 180 S.W.3d 340, 350–51 (Tex. App.—Dallas
2005, no pet.) (concluding that evidence that defendant was principal, if not sole,
shareholder of company did not support piercing corporate veil where no
evidence supported allegation that he stripped corporation of its assets).  

          We disagree that the stock purchase warrants that Nevada Gold issued in
Gillman’s name constitute any evidence to support a finding of unity.  Nothing in the record suggests the purpose of
the warrants was not a practice undertaken in the ordinary course of
business—in other words, that the company wrongfully issued them or that the
issuance of warrants to the CEO destroys corporate formalities.  The only evidence explaining American
Heritage’s payment of insurance for luxury cars shows that American Heritage
used the cars to transport high roller gamblers and tribal leaders in
connection with the casino business. 
Neither of these facts supports a reasonable inference that Gillman
commingled corporate and personal assets or wrongfully diverted corporate
assets for his personal use.  

          We hold that the trial court properly
granted j.n.o.v. on this issue because no evidence would allow a reasonable
jury to find that holding
only American Heritage responsible would result in injustice.  Here, no facts show, for example, that
American Heritage was undercapitalized, that Gillman commingled personal and
corporate assets to the corporation’s detriment, or that Gillman led Nevada
Gold to believe it was dealing with him personally and used American Heritage
as a shield from personal liability.   See Hoffman, 180 S.W.3d at 350–51.  Accordingly, under the totality of the
circumstances, we agree with the trial court that the evidence is legally
insufficient to support a finding that observing the corporate form would lead
to injustice.

Conclusion

 

We hold
that Nevada Gold has standing and that the trial court properly entered
judgment for liability and damages on its breach of contract claim against
American Heritage.  We further hold that
the trial court properly concluded that Gillman is not individually liable for
American Heritage’s damages under an alter ego theory.  Finally, we conclude that Nevada law does not allow for prejudgment
interest on this contract claim.  We
therefore modify the judgment to delete the award of prejudgment interest and
as modified, affirm.    

 

 

Jane Bland

                                                          Justice

 

Panel
consists of Chief Justice Radack and Justices Alcala and Bland.

 

 

 











[1] Noting that Great American had claimed the
right to avoid any obligation under its surety contract with General Builders “simply because it had the power to
cancel the bonds, rather than the right to cancel the contract in response to a material breach by General Builders,”
the Nevada Supreme Court concluded that Great American had not properly pleaded
rescission as a defense.  Great Am. Ins. Co. v. Gen. Builders, Inc.,
934 P.2d 257, 262–63 (Nev.
1997).

 





[2] Nevada, like Texas,
generally follows the Restatement (Second) of Contracts.  See,
e.g., Zhang v. Eighth Judicial Dist. Court of State
ex rel. County of Clark, 103 P.3d 20,
23-34 (Nev. 2004) (agreeing with Restatement (Second) of Contracts and
Professor Corbin’s rejection of “the notion that rescission of a contract
that is executory on both sides supplies consideration for a simultaneous
new agreement” (emphasis in original));
NOLM, LLC v. County of Clark, 100
P.3d 658 (Nev. 2004); Traffic Control
Servs., Inc. v. United Rentals Nw., Inc., 87 P.3d 1054 (Nev. 2004).  

 





[3] American Heritage attempts to uphold its attempt to
obtain a rescission finding by invoking Rule 279 of the Texas Rules of
Appellate Procedure in its reply brief, but that rule has no application
here.  See Tex. R. Civ. P.
279 (providing that, under specified circumstances, trial court may make findings on omitted elements in support of the judgment) (emphasis
added). 

 





[4] This fact appears throughout the record—in Nevada
Gold’s pleadings, motion in limine, and its Combined Motion to Disregard Jury
Finding and Motion for Judgment on the Verdict. 
Also, a copy of the September 27, 2002 arbitration demand is attached to
Nevada Gold’s Combined Motion. 





[5] We do not suggest that an aggrieved party can obtain a
double recovery by foregoing its election of remedies until judgment.  Here, Nevada Gold accounted for the cash
expenditure in connection with calculating its contractual profit.  American Heritage does not contend that
Nevada Gold receives a double recovery, but instead argues that Nevada Gold
completely eliminated its right to benefit of the bargain damages when it
sought, and received, a return of its cash expenditure.  





[6]
See Texas Pattern Jury Charges PJC 110.2 (2006
ed.).





[7]  American
Heritage relies on Texas law in challenging
the competence and admissibility of Domijan’s testimony, and Nevada Gold does
not identify any material difference between Texas
law and Nevada
law on these issues.  Accordingly, for
purposes of this analysis, we presume that Nevada
law and Texas
law are the same.  See Coca-Cola Co. v. Harmar Bottling Co., 218 S.W.3d 671, 685 (Tex. 2006).  





[8]
We decline Nevada Gold’s invitation to construe
this reference to an “established market price” as allowing for reference to
American Heritage’s books and records.  





[9] The parties make much of whether Texas
or Nevada law
applies to this alter ego finding, but, for purposes of this case, we do not
discern a meaningful difference between the laws of the two states concerning
the unity element of the alter ego doctrine. 
Compare Polaris Indus. Corp. v. Kaplan, 747 P.2d 884, 886 (Nev. 1987) (holding that for alter ego
to exist, corporation must be influenced and governed by person asserted to be
alter ego, there must be such unity of interest and ownership that one is
inseparable from other, and facts must be such that adherence to corporate
fiction of separate entity would, under circumstances, sanction fraud or
promote injustice) with Mancorp, Inc. v.
Culpepper, 802 S.W.2d 226, 228 (Tex. 1990) (stating that “under the alter
ego theory, courts disregard the corporate entity when there exists such unity
between corporation and individual that the corporation ceases to be separate
and when holding only the corporation liable would promote injustice.”).